UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

IN RE APPLICATION OF MIHAILS
ULMANS FOR JUDICIAL ASSISTANCE
PURSUANT TO 28 U.S.C. § 1782

**Case No MC 22-0052-PHX-GMS**



**Ojars Bunkus**
personal identification code: 230356-12878
e-mail: ojars.bunkus@gmail.com

**Kaspars Bunkus**
personal identification code: 120877-12869
e-mail: kaspars.bunkus@jfmb.eu

**Kristaps Bunkus**
personal identification code: 010883-12855
e-mail: kristaps@bunkus.lv

**OBJECTION**
**TO APPLICATION OF MIHAILS ULMANS FOR JUDICIAL ASSISTANCE**

According to publicly available information on November 23, 2022 applicant Mihails Ulmans, personal identification code 120653-11239, applied to the United States District Court for the District of Arizona (hereinafter referred to as the – "**Court**") for an order of judicial assistance to gather documentary and testimonial evidence from David Merkel and Summit International Advisors, LLC in connection with the criminal proceedings pending in the Republic of Latvia in the case of the murder of Latvian attorney a law Martins Bunkus, personal identification code 210280-12859.

According to publicly available information businessmen of the Republic of Latvia Mihails Ulmans and Aleksandrs Babenko have been charged in connection with the murder of attorney at law Martins Bunkus.

During the press conference of December 8, 2022, Chief Prosecutor Armins Meisters of the Prosecutor's Office of the Riga Court District of the Republic of Latvia, while reporting on the progress of the investigation of the murder of attorney at law Martins Bunkus, provided the following information:

*"[..] the preparation of this criminal offense was very careful and it should be noted that in fact these persons who are connected with this criminal offense acted as hardened criminals and not beginners whose way of life is the criminal world and its principles of operation. Therefore, in fact, their whole thinking is like how we come to work, so they plan everyday how to hurt someone, rob someone. Along with this, there is information about the connection of these persons with other murders, both already occurred and planned. These are seriously hardened criminals who, in their understanding, carried out this murder on a professional level, and that is why it was so difficult to resolve it and a huge resource had to be invested.*

*[..] And also, as the overall picture was formed, by obtaining evidence, [it] indicated that these persons have been operating in the criminal environment for a long time and are involved in one or another role in other murders, illegal activities with weapons, various other criminal offenses that are characteristic of the world of organized crime."*

Mihails Ulmans in the Republic of Latvia is an intermediate co-owner of a credit institution JSC "LPB Bank", Latvian company registration number 50103189561 (Annex 1). As announced by the Chief Prosecutor of the Republic of Latvia, Armins Meisters, in the said criminal proceedings, among other things, evidence has been obtained which indicates that the persons connected with the murder of attorney at law Martins Bunkus have been active in the criminal environment for a long time (murders, illegal activities with weapons, various other criminal offenses typical of the world of organized crime). Therefore, it could also mean a serious investigation into the JSC "LPB Bank" whose intermediate co-owner is Mihails Ulmans.

Also, it is necessary to point out the alleged close relations with high-ranking officials of the persons currently charged in the case of the murder of attorney at law Martins Bunkus - Mihails Ulmans and Aleksandrs Babenko.

It has emerged that Mihails Ulmans may have had great opportunities to influence the course of the investigation of the murder of attorney at law Martins Bunkus. Namely, Andrejs Sozinovs, the former head of the Riga Region Criminal Police Department of the Republic of Latvia, who led the police operation in the first hours after the shooting of the attorney at law Martins Bunkus, worked for JSC "LPB Bank", whose intermediate co-owner is Mihails Ulmans. Also, the media reports that Andrejs Sozinovs was probably also familiar with the other person currently charged in the case of the murder of attorney at law Martins Bunkus – Aleksandrs Babenko.[1]

While the high-ranking police officer Andrejs Sozinovs continued to hold the position of the head of the Riga Region Criminal Police Department of the Republic of Latvia, the solving of the murder case of the attorney at law Martins Bunkus did not move an inch.

As the media reports, concerns about Andrejs Sozinovs' reputation were the reason why he was transferred to the less influential Department of the Zemgale region in 2020. According to the latest publicly available information, Andrejs Sozinovs no longer works in the State Police of the Republic of Latvia, and currently Andrejs Sozinovs is charged in a criminal case pending in the Vidzeme Suburb Court of Riga City of the Republic of Latvia of collecting secret documents using his official position, as well as of money laundering.[2]

However, there is reason to suspect that Mihails Ulmans' alleged connections with high-ranking officials in the State Police of the Republic of Latvia have probably not run out. Recently, information came to the disposal of the victims that Mihails Ulmans has connections in law enforcement structures. Later, it became publicly known that in connection with the case of the murder of attorney at law

---

[1] NRA.lv, "The former chief of the Riga criminal police was in close relations with the suspects in the Bunkus murder". The source in Latvian is available at: https://nra.lv/latvija/384279-bijusais-rigas-kriminalpolicijas-prieksnieks-bijis-ciesas-attiecibas-ar-bunkus-slepkaviba-aizdomas-turamajiem.htm.

[2] TV3.lv, "Sozinovs has been charged with collecting secret documents and money laundering by purchasing an apartment in Spain". The source in Latvian is available at: https://zinas.tv3.lv/latvija/sozinovs-apsudzets-par-slepenu-dokumentu-vaksanu-un-naudas-atmazgasanu-iegadajoties-dzivokli-spanija/.

2.

Martins Bunkus in October 2022, a high-ranking police officer of the Homicide investigation department - Janis Kapostins, was suspended. A disciplinary case was initiated against him.[3]

We, the father Ojars Bunkus, personal identification code 230356-12878, and the brothers Kaspars Bunkus, personal identification code 120877-12869, and Kristaps Bunkus, personal identification code 010883-12855, of the murdered attorney at law Martins Bunkus, who are also recognized as victims in the mentioned criminal proceedings, have already raised an alarm in the Republic of Latvia about the (at that time) suspects' possible attempts to influence the course of the Martins Bunkus murder investigation with various methods.

Unfortunately, we have to conclude that the obstruction of the investigation is likely to continue gaining momentum.

Application to the Court for an order of judicial assistance to gather documentary and testimonial evidence from David Merkel and Summit International Advisors, LLC has been based on the Declaration of Latvian attorney at law Janis Zelmenis (hereinafter referred to as the "**Declaration**").

Having familiarized ourselves with the publicly available content of the Declaration and its Annexes, we have a reason to conclude that:

1. Application to the Court for an order of judicial assistance to gather documentary and testimonial evidence from David Merkel and Summit International Advisors, LLC is **based on Declaration, which contains false, incorrect, and misleading information provided to the Court by the attorney at law Janis Zelmenis**. It is believed that in such a manner, by providing **false, incorrect, and misleading information to the Court** efforts are made to obtain documents and information to, presumably, obstruct the investigation of the murder of the attorney at law Martins Bunkus;

2. **As a result of the direct actions of the attorney at law Janis Zelmenis, the secret of investigation in the criminal proceedings of the murder case of an attorney at law Martins Bunkus is revealed**, which threatens the course of the criminal proceedings and which demonstrates the elements of the criminal offense provided for in Article 304 and Article 307.[1] of the Criminal Law of the Republic of Latvia.

### *[1.] Timeline.*

On May 30, 2018, a public official and a person belonging to the judicial system of the Republic of Latvia – attorney at law Martins Bunkus, was murdered in a cold-blooded and brutal manner in a public place in the capital of the Republic of Latvia, Riga.

On May 30, 2018, criminal proceedings No 11511001018 (hereinafter referred to as the "**Criminal Proceedings**") were initiated regarding the fact of the murder of attorney at law Martins Bunkus. In the Criminal Proceedings, the father of Martins Bunkus, Ojars Bunkus, and the brothers of Martins Bunkus, Kaspars Bunkus and Kristaps Bunkus, have been recognized as victims (hereinafter all together referred to as the "**Victims**").

---

[3] TV3.lv, "The fourth person arrested in the Bunkus murder case is the bodyguard and driver of the criminal authority G. Valagins." The source in Latvian is available at: https://zinas.tv3.lv/latvija/neka-personiga/ceturtais-apcietinatais-bunkus-slepkavibas-lieta-ir-kriminalas-autoritates-g-valagina-miesassargs-un-soferis/

3.

On May 24, 2022, the Main Criminal Police Department of the State Police of the Republic of Latvia publicly issued a statement that the **4-year investigation of the murder of attorney at law Martins Bunkus has resulted in success and that the chain of in fact all persons involved in the crime, from the person who ordered the murder (instigator) to the organizer and executor, has been discovered**; as well as during carefully planned operation several persons were detained, including the executor and person who ordered the murder.

According to publicly available information Mihails Ulmans and his long-time business partner - Aleksandrs Babenko, were detained as part of the investigation of the murder of attorney at law Martins Bunkus. Such a security measure was applied to the mentioned persons because, in the opinion of the State Police of the Republic of Latvia, there are risks, among others, that Mihails Ulmans and Aleksandrs Babenko, may interfere with the investigation and influence the witnesses.[4]

The court of the second instance - the Riga Regional Court of the Republic of Latvia, also decided to keep Mihails Ulmans and Aleksandrs Bobenko in custody, finding that there is no reason to change the security measure applied by the court - detention for the mentioned suspects. On July 25, 2022, the court rejected the attempts of Mihails Ulmans and Aleksandrs Babenko, to change the security measure, keeping both suspects in the crime in custody. Also, according to the next successive court rulings of the Republic of Latvia, the security measure applied to the mentioned persons was not changed.

At the press conference of December 8, 2022 (hereinafter referred to as the **"Conference"**), which was organized and attended by representatives of the law enforcement institutions of the Republic of Latvia: Chief Prosecutor of the Prosecutor's Office of the Riga Court District Armins Meisters, Prosecutor of the Prosecutor's Office of the Riga Court District Aldis Lasmanis and the Head of the Department of Combating Serious and Serial Organized Crime of the Main Criminal Police Department of the State Police Peteris Bauska, it was announced that on November 24, 2022, in the case of the murder of attorney at law Martins Bunkus charges have been brought against 3 persons. Namely, against 2 persons for inciting to commit this murder and against 1 person for supporting the murder.

It was also announced at the Conference that **on September 27, 2016, there was an attempt to murder Martins Bunkus, but this attempt failed, and the murder was carried out on May 30, 2018**.

According to publicly available information, it is possible to establish that the previously mentioned Mihails Ulmans and his long-time business partner - Aleksandrs Babenko, have been charged with inciting to commit murder (ordering the murder) of attorney at law Martins Bunkus.

To provide the Court with the true circumstances regarding the relationship between the attorney at law Martins Bunkus and Mihails Ulmans, hereby we attach as Annex 2 the judgment of February 25, 2021, in Latvian court case No C30753819 (Annex 2), which has come into legal effect and has established, among other things, the following:

In his application to the Prosecutor General of the Republic of Latvia dated February 8, 2016, attorney at law Martins Bunkus among other things stated: *"[..] I also have a real fear that violence and physical settling an account may be used against me in M.Ulmans' assignment [..]."*

---

[4]Broadcast "Nothing Personal [Nekā personīga]", "The experienced policeman was in close relations with the persons detained by the police for the murder of Bunkus". The source in Latvian is available at: https://zinas.tv3.lv/latvija/neka-personiga/pieredzejis-policists-bijis-ciesas-attiecibas-ar-personam-kuras-policija-apcietinajusi-par-bunkus-slepkavibu/.

On March 8, 2016, attorney at law Martins Bunkus stated to the Corruption Prevention and Combating Bureau of the Republic of Latvia: *"[..] I have also received threats and pressure was put on me to issue a power of attorney to terminate the legal proceedings initiated against M.Ulmans and to terminate the criminal proceedings No 11514002509 for bringing MSIA "Rego Trade" to insolvency. <u>I was also warned that if I did not give such power of attorney, then I would have to face negative consequences and problems with law enforcement authorities.</u> However, despite the threats expressed to me and the pressure put on me, I continued to fulfill my duties as an administrator according to the requirements of the Insolvency Law [..]".*

*"[..] Immediately after the announcement of such court rulings, <u>M.Ulmans' threats intensified. I was told that M.Ulmans would "sort things out" by involving officials on a larger scale and would provide me with problems.</u> Among his acquaintances, M. Ulmans is boasting of very close relations with senior officials of various law enforcement agencies and spreading information that money has already been transferred to such officials and problems with law enforcement agencies are guaranteed for me, <u>I will be removed from the position of administrator of MSIA "Rego Trade" and he will take serious revenge on me and settle an account with me [..]."*</u>

Whereas on July 18, 2016, in his explanations to the Corruption Prevention and Combating Bureau attorney at law Martins Bunkus stated that: *"[..] Also now, at the end of 2015, after September 16, 2015, when the Supreme Court decided to consider my cassation complaint regarding the recovery of EUR 1,333,131.29 from M. Ulmans in an expanded composition, but on October 26, 2015, the Civil Court Chamber of the Supreme Court pronounced a judgment on the recovery of EUR 721,186.20, <u>the threats from M.Ulmans intensified. M. Ulmans spread the information among his close people that he would take serious revenge, he would attract high-ranking officials and problems with law enforcement institutions would be guaranteed for me, because he had already given the money.</u> A person close to M.Ulmans provided me with that information, which I unequivocally perceived as a threat from M.Ulmans, which had been expressed intermittently.*

*[..] I have intermittently received threats, namely M. Ulmans spread the information among his close people that he would "sort things out" by attracting high-ranking officials and money had already been given to them and problems with law enforcement authorities were guaranteed for me, I <u>would be removed from the position of administrator of MSIA "Rego Trade" and he would take serious revenge on me and settle accounts with me.</u> Also, M. Ulmans spread the information among his close people that <u>if I did not withdraw the legal proceedings against him, then the campaigns and publications defaming me and my family members would be continued.</u>*

*[..] <u>M. Ulmans also carried out public smear campaigns against me and my family members, using the services of the portal www.pietiek.com and paying for them.</u> This also confirms the seriousness of M. Ulmans' threats and the unequivocal intention to implement these threats.*

*I also perceived as a threat the case when, in a conversation with a person I know personally, <u>M. Ulmans' trusted person mentioned, among other things, the case between me and MSIA "Rego Trade", stating that people tend to be shot for such similar cases, as it once happened with M. Ulmans' associate.</u> I also perceived such a message from M. Ulmans' trusted person as a very serious threat to me that <u>M.Ulmans does not rule out the possibility of settling an account with me physically.</u> The pressure was applied in such a way that countless fabricated and baseless complaints were made about me.*

*[..] I want to make it clear that I continue to feel threatened and anxious that the threats will continue to be carried out. M. Ulmans has actually started to fulfill his threats, both by involving a high-ranking official - possibly A. Sozinovs, and possibly even by trying to bribe the court. A public smear campaign was carried out against me and my family members. Every day I live with anxiety about the life and health of myself and my family. With the message that people were shot in similar cases, as happened with M. Ulmans' associate, I was made to understand that M. Ulmans does not rule out settling an account physically.*

*Since M.Ulmans has already started to implement his threats, I consider the threats to be very real and serious. [..]"*

*[Paragraph 9.2.2 of the judgment of February 25, 2021, in case No. C30753819]*

Please find enclosed excerpt of judgment of February 25, 2021, in case No. C30753819 translated from Latvian to English as Annex 3.

**[2.] Attorney at law Janis Zelmenis has clearly and unequivocally violated the declaration given to the Court about the provision of the true and correct information and has provided the Court with false, incorrect, and misleading information that does not correspond to the actual circumstances.**

At the disposal of Victims is information that based on the Declaration provided by Janis Zelmenis, an attorney at law practicing in the Republic of Latvia, an application for an order of judicial assistance to gather documentary and testimonial evidence from David Merkel and Summit International Advisors, LLC with an aim to identify "alternative suspects" in the case of the murder of attorney at law Martins Bunkus *[Section 22 and 32 of the Declaration of J. Zelmenis]* has been submitted to the Court.

Having familiarized themselves with the publicly available content of Janis Zelmenis' Declaration and its annexes, the Victims have established that **attorney at law Janis Zelmenis has clearly and unequivocally violated the declaration given to the Court about providing true and correct information**. Attorney at law Janis Zelmenis has most likely deliberately provided the Court with false, incorrect, and misleading information that does not correspond to the actual circumstances in respect of the murdered attorney at law Martins Bunkus and other aspects presented in the Declaration. Based on such false information, **efforts are being made to retrieve through the Court such materials, which would most likely provide Mihails Ulmans with an opportunity to counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia**.

In Section 2 of the Declaration attorney at law Janis Zelmenis declares that: *"Unless otherwise noted, the information contained in this declaration is within my personal knowledge, as well as obtained from reliable public sources."* Janis Zelmenis also declares that: *"In making certain statements below, I rely on my experience as a Latvian attorney familiar with the Latvian legal system."* *[Section 2 of the Declaration of J. Zelmenis]*. Whereas, in Section 35 of the Declaration Janis Zelmenis clearly and unequivocally states that: *"I declare under penalty of perjury that the foregoing is true and correct"*. *[Section 35 of the Declaration of J. Zelmenis]*

However, contrary to the declarations provided to the Court, the attorney at law Janis Zelmenis has provided the Court with clearly false, incorrect, and misleading information that does not correspond to

6.

the actual circumstances, which can be verified by any person by looking in the publicly available database of the Enterprise Register of the Republic of Latvia. Namely, in Section 25 of the Declaration Janis Zelmenis clearly states that: "[..] *in or around 2017, Mr. Bunkus served as the insolvency administrator for a Latvian bank called Trasta Komercbanka [..]*" [*Section 25 of the Declaration of J. Zelmenis*] (hereinafter joint stock company in liquidation "TRASTA KOMERCBANKA" referred to as the TRASTA KOMERCBANKA). Based on this unequivocal statement, Janis Zelmenis forms his further assumptions about attorney at law Martins Bunkus, based on which efforts are being made to retrieve through the Court such materials, which would most likely provide Mihails Ulmans with an opportunity to counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia.

The Victims draw the Court's attention to the fact that attorney at law Martins Bunkus was never the insolvency administrator of TRASTA KOMERCBANKA. The true and correct information is available in the database of the Register of Enterprises of the Republic of Latvia, which is publicly available and according to Article 4.[11] of the Law On the Enterprise Register of the Republic of Latvia is true and reliable, and correspond to entries of the registers kept by the Enterprise Register, other registered information, and the documents in the registration file.

Please see in the attachment the printout from the database of the Enterprise Register of the Republic of Latvia regarding TRASTA KOMERCBANKA. The printout clearly demonstrates that attorney at law Martins Bunkus was not the insolvency administrator of TRASTA KOMERCBANKA neither in 2017 nor in any other period (Annex 4).

Considering that Janis Zelmenis is an attorney at law practicing in the Republic of Latvia, who, as he himself states, has long-term legal experience *[Section 3 of the Declaration of J. Zelmenis]* - there is a reason to assume that Janis Zelmenis knows and, as he himself stated in Section 2 of his Declaration, has verified at *reliable public sources* that attorney at law Martins Bunkus was never the insolvency administrator of TRASTA KOMERCBANKA. Therefore, there is a reason to suspect that attorney at law Janis Zelmenis has most likely provided the Court with such false and incorrect information deliberately.

The information about the professional duties of an attorney at law Martins Bunkus is not the only false information that attorney at law Janis Zelmenis has provided to the Court. Janis Zelmenis states in Section 30 of the Declaration that: *"[..] Mr. Bunkus's father is linked to a UK partnership, Kentprom Management LLP [..], that owned an undeclared upscale residence in Riga."* [*Section 30 of the Declaration of J. Zelmenis*]

However, contrary to Janis Zelmenis' statement to the Court, Kentprom Management LLP has never owned an "undeclared upscale residence in Riga". Information about the real estates of the Republic of Latvia, including their owners, is published in the database of the State Unified Computerized Land Register of the Republic of Latvia. According to Article 1 of the Land Registry Law of the Republic of Latvia, immovable properties are recorded in the Land Registers, and the rights related thereto are corroborated therein; Land Registers are available to everyone and the entries thereof are publicly reliable.

Please see in the attachment the printout from the Land Registry of the Republic of Latvia regarding the real estate and its owners to which Janis Zelmenis most likely refers in his Declaration. This printout verifies that this real estate has never belonged to the UK company Kentprom Management LLP (Annex

5). The real estate belongs to a company registered in the Republic of Latvia, which has fulfilled all the requirements of the regulatory acts of the Republic of Latvia, including the declaration of transactions. In addition, this real estate was purchased by the company of the Republic of Latvia on **November 13, 2013, not in the *"same period"*, which in the sense of Janis Zelmenis Declaration is *"in or around 2017"*.** Thus, the lies of attorney at law Janis Zelmenis are even mutually contradictory.

Considering that Janis Zelmenis is an attorney at law practicing in the Republic of Latvia, who, as he himself states, has long-term legal experience *[Section 3 of the Declaration of J. Zelmenis]* - there is a reason to assume that Janis Zelmenis knows and, as he himself stated in Section 2 of his Declaration, has verified at *reliable public sources* that Kentprom Management LLP never owned an *"undeclared upscale residence in Riga"*. Therefore, there is a reason to suspect that attorney at law Janis Zelmenis has most likely provided the Court with such false and incorrect information deliberately.

It is clearly visible how attorney at law Janis Zelmenis complements one blatantly false statement to the Court with another false statement. There is a reason to believe that in such a manner Janis Zelmenis also tries to grant credibility to his invented assumptions about attorney at law Martins Bunkus. **With such dishonest methods attorney at law Janis Zelmenis not only ungroundedly tries to undermine the reputation of his deceased colleague - attorney at law Martins Bunkus, but also, most likely, tries to manipulate the third party's perception of Martins Bunkus' personality to facilitate the implementation of the interests of Mihails Ulmans.**

In addition to the blatantly false statements given by Janis Zelmenis mentioned above, he also does not hesitate to put forward such fabricated assumptions that: *"Members of organized crime networks in former Soviet states and the Baltics who felt extorted by Mr. Bunkus's alleged tactics during the Trasta Komercbanka insolvency process are obvious suspects in Mr. Bunkus's eventual murder."* *[Section 29 of the Declaration of J. Zelmenis].*

Not only it is not clear where such ungrounded theories of Janis Zelmenis came from, but it must also be pointed out once more that attorney at law Martins Bunkus was not the insolvency administrator of TRASTA KOMERCBANKA and was not involved in any kind of illegal activities.

Also, attorney at law Janis Zelmenis does not hesitate to state that: *"According to various public sources, including direct interviews of the executive deputy of the parliament of the Republic of Latvia, Mr. Bunkus demanded significant kickbacks from multiple accountholders as a prerequisite to his releasing accountholder funds."* *[Section 27 of the Declaration of J. Zelmenis]*

Once again, it is not clear where such ungrounded theories of Janis Zelmenis came from and which *executive deputy of the parliament* interview Janis Zelmenis was referring to, because attorney at law Martins Bunkus has never been involved in such activities and, as Janis Zelmenis should have known, attorney at law Martins Bunkus has never been the insolvency administrator or a liquidator of any credit institution of the Republic of Latvia to even be able to control (*release*) the accountholder funds.

Contrary to the efforts of attorney at law Janis Zelmenis to provide distorted and false information about attorney at law Martins Bunkus based on false statements and assumptions, it should be noted that Martins Bunkus was an attorney at law with more than 18 years of professional work experience. He led a successful law firm and worked as a public official – an insolvency administrator. Contrary to the efforts to destroy the reputation of Martins Bunkus with ungrounded false facts and assumptions about his professional activities and personality - **Martins Bunkus had never been punished for**

**professional misconduct and until the day of his death he fulfilled his duties as an attorney at law and insolvency administrator in good faith and in accordance with the regulatory framework.** On the other hand, the information provided by attorney at law Janis Zelmenis to the Court contains blatantly false information and assumptions, which are most likely aimed at efforts to manipulate the third party's perception of the personality of attorney at law Martins Bunkus and the events before his murder on May 30, 2018, presumably to facilitate the implementation of Mihails Ulmans' likely interests to counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia.

At the same time, it should be pointed out that attorney at law Janis Zelmenis, when providing a false statement to the Court that: *"[..] in or around 2017, Mr. Bunkus served as the insolvency administrator for a Latvian bank called Trasta Komercbanka [..]."* [*Section 25 of the Declaration of J. Zelmenis*], he did not take into account that already **on September 27, 2016, the attempted murder of attorney at law Martins Bunkus took place**, which Martins Bunkus reported to the police still during his lifetime. According to the information provided by the representatives of the law enforcement agencies at the Conference, since the murder on September 27, 2016, did not succeed due to reasons beyond the control of the murder executors (the weapon did not fire), the murder was postponed to a later time and was carried out on May 30, 2018.

Also, attorney at law Janis Zelmenis has concealed the publicly available information that attorney at law Martins Bunkus had received death threats from Mihails Ulmans which Martins Bunkus reported to both the Prosecutor General of the Republic of Latvia and the Corruption Prevention and Combating Office of the Republic of Latvia *[please also see the information provided by Martins Bunkus to the Prosecutor General of the Republic of Latvia and the Corruption Prevention and Combating Office in the judgment of February 25, 2021, attached in Annex 1 No. C30753819 in paragraph 9.2.2].*

*[3.] Suspicion of attempts to counteract to and obstruct the investigation.*

There is a reason to suspect that the attorney at law Janis Zelmenis is not a neutral and objective person as he may present himself in the Declaration, but rather a defender of the interests of Mihails Ulmans, implementing the search for "alternative suspects", which could provide Mihails Ulmans with an opportunity to counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia.

On June 3, 2022, or less than two weeks after the arrest of Mihails Ulmans and Aleksandrs Babenko, SIA "Mono", Latvian company registration No 40003004625, whose beneficiary and 49.43% owner is Mihails Ulmans (Annex 6), announced a reward of EUR 1,000,000.00 (one million euros) for solving the murder case of an attorney at law Martins Bunkus,[5] although the State Police of the Republic of Latvia has already announced on May 24, 2022 that the case is solved, and invited all persons who may know some important information to report to the police voluntarily and cooperate with the police.[6]

---

[5] SIA "MONO", ""MONO" announces a reward of one million EUR for solving the murder of M. Bunkus." The source in Latvian is available at: https://www.mono.lv/news/mono-izsludina-viena-miljona-eur-atlidzibu-par-m-bunkus-slepkavibas-atklasanu/

[6] The State Police of the Republic of Latvia, "An important turning point in the Bunkus murder investigation - the chain of almost all persons involved in the crime has been discovered; arrests made today". Source in Latvian available at: https://www.vp.gov.lv/lv/jaunums/bunkus-slepkavibas-izmeklesana-butisks-paversiens-noskaidrota-gandriz-visu-nozieguma-iesaistito-personu-kede-sodien-veiktas-aizturesanas

*9.*

Whereas, a little later, to the public was released a new web page www.monografija.info and related social network accounts were created under the single name *Monografija*. On the portal www.monografija.info as well as on *Monografija* social network accounts (Youtube, Twitter, Facebook) three short films (hereinafter referred to as the – "**Short Films**") by an author unknown to the public were published, distributed, and popularized (including trough paid advertainments) in Latvian, Russian and English.

In the 3rd episode of the Short Films called "Episode 3. New Action-Packed Series! What is happening in Latvia?"[7], among several other persons close to Mihails Ulmans participated also attorney at law Janis Zelmenis. These persons gave statements in response to the detention of Mihails Ulmans. These statements included phrases such as:

*"It is like playing chess for him [meaning Mihails Ulmans], simply a process, a pleasure!"*[8]

*"Yes, in fact some strong player has attacked, but they don't know who they're playing with. Ulman is Kasparov or Kasparov squared"*[9]

*"[..] there isn't the slightest doubt that Mihail Ulman will come victorious out of this situation."*[10]

*"[..] I swear that we will do everything possible to make sure that the people involved in this vicious attack on the business and on the life of my friend [meaning Mihails Ulmans] will be punished."*[11]

*"[..] we will get to the bottom of this, and we will investigate the people involved."*[12]

*"We are very, very angry, and we will bring this to justice."*[13]

*"[..] don't make any mistakes in terms of us being weak, us being not able to prosecute. We will do this, and we will involve the top people in the United States to do this. We are with you, Mihail! We stand behind you, and we will get you out of this. Free Ulman!"*[14]

The reward announced by SIA "Mono", which contains signals about the possible intention to identify "alternative suspects" in an already solved case, and the statements made by close associates of Mihails Ulmans in the 3rd episode of the Short Films, reinforce the suspicion that the Declaration of attorney at law Janis Zelmenis, which is based on false and incorrect information, is nothing more than an effort to exploit the U.S. legal system to retrieve documents to identify "alternative suspects" [*J. Paragraphs 22 and 32 of the Declaration*], to facilitate the implementation of Mihails Ulmans' likely interests to

---

[7] MONOGRAFIJA, "Episode 3. New Action-Packed Series! What is happening in Latvia?" Available at: https://www.youtube.com/watch?v=dD2eXNCWdow

[8] Oleg Gushchin (MONOGRAFIJA), "Episode 3. New Action-Packed Series! What is happening in Latvia?" Available at: https://www.youtube.com/watch?v=dD2eXNCWdow

[9] Ibid.

[10] Ibid.

[11] Alexei Petrov (MONOGRAFIJA), "Episode 3. New Action-Packed Series! What is happening in Latvia?" Available at: https://www.youtube.com/watch?v=dD2eXNCWdow

[12] Ibid.

[13] Ibid.

[14] Ibid.

*10.*

counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia.

In the 3rd episode of the Short Films, along with persons close to Mihails Ulmans, attorney at law Janis Zelmenis publicly defends the innocence of Mihails Ulmans. In the 3rd episode of the Short Films, attorney at law Janis Zelmenis states that: "*I am therefore waiting with great interest to see how quickly the police will finish their work and the prosecution will be able to press charges, because only then can the defense finally get down to the real work. At the moment we have nothing to work with, except that we are working with revocation and the modification of Mr Ulman's preventive measure.*" [15] Thus, attorney at law Janis Zelmenis recognizes that he is one of the persons who acts as the defense of Mihails Ulmans and represents the interests of Mihails Ulmans.

As one of the counter-arguments for the custody of Mihails Ulmans, Janis Zelmenis puts forward in the 3rd episode of the Short Films that: "*Of course, it's unfair to treat one of the wealthiest people of Latvia this way,*" [16] but has not mentioned any of what he claims in the Declaration.

In addition, attorney at law Janis Zelmenis when presenting his professional background to the Court has hidden following information. Namely, at our disposal is information that **attorney at law Janis Zelmenis is currently recognized as a suspect in a financial fraud case in the Republic of Latvia**. The aforementioned only adds to the doubts about the objectivity of the attorney at law Janis Zelmenis and the compliance of his work methods with the regulatory framework of the Republic of Latvia and the principles of the work ethic of attorneys at law as such.

Therefore, there is a reason to suspect that the attorney at law Janis Zelmenis is not a neutral and objective person, but rather a defender of the interests of Mihails Ulmans, who, as is evidenced by the content of the Declaration, most likely deliberately manipulates information in the interests of Mihails Ulmans and was most likely hired for the preparation of the Declaration corresponding to the interests of Mihails Ulmans, which could facilitate the implementation of Mihails Ulmans' likely interests to counteract to and obstruct the investigation of the murder of attorney at law Martins Bunkus and the subsequent trial process in the Republic of Latvia

### *[4.] Disclosure of secret of investigation that jeopardizes the course of Criminal Proceedings.*

Janis Zelmenis, an attorney at law practicing in the Republic of Latvia, who is familiar with the legal system of the Republic of Latvia *[Section 2 of the Declaration of J. Zelmenis]*, with his actions, by adding to the Declaration documents containing the investigation materials of the murder case of an attorney at law Martins Bunkus, namely the decision of September 28, 2022, on recognizing a person as a suspect; the decision of the Riga City Court of September 30, 2022, and, as it can be concluded from the public case materials, also the decision of December 3, 2022, on summoning a person to criminal liability, **without any indication to the Court about the specific protection of this information and, most likely, without the permission of the investigator or the prosecutor of the Republic of Latvia has made the materials of Criminal Proceedings, which contain the secret of the investigation, public. As a result of the actions of attorney at law Janis Zelmenis, significant risks have been posed, which may threaten the course of the Criminal Proceedings.**

---

[15] Janis Zelmenis (MONOGRAFIJA), "Episode 3. New Action-Packed Series! What is happening in Latvia?" Available at: https://www.youtube.com/watch?v=dD2eXNCWdow
[16] Ibid.

*11.*

Namely, the Criminal Proceedings have not yet been completed, there is undergoing pre-trial investigation. Mihails Ulmans, the person charged in the case of the murder of attorney at law Martins Bunkus was placed into custody. The application of custody has been repeatedly extended, including due to the risks of obstruction of the pre-trial criminal proceedings, as well as risks of influencing witnesses.

It follows from the first part of Article 375 of the Criminal Procedure Law of the Republic of Latvia that **all criminal case materials are a secret of the investigation during the entire criminal proceedings**.

The doctrine of the Criminal Law of the Republic of Latvia states that the materials of a criminal case are the protocols of the investigation and court proceedings collected therein, rulings of the investigator, prosecutor, court, judge, expert opinions, as well as other documents and material evidence that relate to the case under investigation or trial.

According to the first part of Article 396 of the Criminal Procedure Law of the Republic of Latvia **information acquired in the pre-trial criminal proceedings until the completion thereof shall be divulged only with the permission of an investigator or a prosecutor and in the amount specified by him or her**.

Article 304 of the Criminal Law of the Republic of Latvia stipulates criminal liability for a person who discloses the data obtained from a pre-trial criminal proceeding without authorization from an investigator or prosecutor until the termination of the proceedings, where he or she has been warned as to non-disclosure of relevant information.

According to findings established in the court rulings of the Republic of Latvia, the criminal offense provided for in Article 304 of the Criminal Law of the Republic of Latvia threatens the jurisdiction's interests in establishing the truth in pre-trial criminal proceedings, thus the legislator, adopting the mentioned criminal law regulation wanted to ensure **that persons do not hinder the establishment of the truth by disclosing the information obtained in the pre-trial investigation.**

Article 307.[1] of the Criminal Law of the Republic of Latvia stipulates criminal liability for the violation of the prohibition to reproduce the materials of the criminal case in any form or of the prohibition to transfer to third persons or otherwise disseminate the information contained in the materials of criminal case that is not subject to publishing if it has been committed by a person who has been warned regarding criminal liability for violating the abovementioned prohibitions.

There is no doubt that the decision of September 28, 2022 on recognition of a person as a suspect; Decision of the Riga City Court of September 30, 2022; and the decision of December 5, 2022 for summoning a person to criminal responsibility are criminal case materials in the context of Article 307.[1] of the Criminal Law of the Republic of Latvia, and contain information falling within the scope of the protection of secret of investigation, including information about the version of the investigation, details about the amount of information that the investigation has so far failed to find out, etc. The disclosure of this information may interfere with the establishment of the truth, as well as can be both a method of influencing witnesses (e.g., circumstances not clarified in the investigation - an instruction to witnesses, about which they must remain silent), and/or the method to convey information to persons not identified in the investigation.

Taking into account the above, it can be concluded that the actions of the attorney at law Janis Zelmenis, adding to the Declaration documents, which contain the investigation materials of the Martins Bunkus murder case protected by the secret of investigation, namely the decision of September 28, 2022 on recognition of a person as a suspect; Decision of the Riga City Court of September 30, 2022; and the decision of December 5, 2022 for summoning a person to criminal responsibility, without any indication to the Court about the specific protection of this information and, most likely, without the permission of the investigator or the prosecutor of the Republic of Latvia (which must have been acquired according to the procedures specified in the regulatory acts of the Republic of Latvia) to disclose this information, has resulted not only in revealing the secret of investigation but also may threaten the course of the Criminal Proceedings.

**Given all the above, we object to the application to the Court for an order of judicial assistance based on the Declaration and ask the Court:**

1. **To evaluate the actions of the attorney at law Janis Zelmenis in providing the Court with false and incorrect information;**
2. **To reject the request for an order of judicial assistance to gather documentary and testimonial evidence from David Merkel and Summit International Advisors, LLC, which is based on the Declaration containing false and incorrect information provided by an attorney at law Janis Zelmenis.**

Annexes:

1. Printout from the Enterprise Register of the Republic of Latvia about JSC "LPB Bank" on 3 pages;
2. Judgment of February 25, 2021, in Latvian court case No C30753819 on 18 pages;
3. Excerpt of judgment of February 25, 2021, in case No. C30753819 translated from Latvian to English on 9 pages;
4. Printout from the Enterprise Register of the Republic of Latvia about JSC " TRASTA KOMERCBANKA " about current officers on 2 pages and about historic officers on 12 pages;
5. Printout from the Land Registry of the Republic of Latvia on 3 pages;
6. Printout from the Enterprise Register of the Republic of Latvia about LLC "Mono" on 4 pages.

Riga, January 13, 2023

Respectfully,

Ojars Bunkus

Kaspars Bunkus

Kristaps Bunkus

# ANNEX 1



Latvijas Republikas Uzņēmumu reģistrs

# Akciju sabiedrība "LPB Bank"
Public Limited Company

## Overview

| | |
|---|---|
| Registration number | 50103189561 |
| SEPA Creditor Identifier | LV40ZZZ50103189561 |
| Legal address | Brīvības iela 54, Rīga, LV-1011 |
| Registered on | 05.09.2008 |
| Type | Public Limited Company |
| Register | Commercial Register |
| Equity capital | Registered equity: 13000000.00 EUR<br>Registered on: 03.02.2016<br>Paid-up equity: 13000000.00 EUR<br>Registered on: 03.02.2016 |
| Annual reports submitted | 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 |

## Officers

| Person data | Position | Appointed | Registered on | Rights of representation |
|---|---|---|---|---|
| Odiņa Alda<br>p.c. 200668-12000 | Executive Board | 12.07.2022 | 12.07.2022 | Jointly with at least {withAtLeast} persons entitled to represent 1 |
| Kononovs Antons<br>p.c. 160174-11823 | Executive Board | 03.10.2018 | 03.10.2018 | Jointly with at least {withAtLeast} persons entitled to represent 1 |
| Preise Baiba<br>p.c. 061268-11018 | Executive Board | 29.04.2019 | 29.04.2019 | Jointly with at least {withAtLeast} persons entitled to represent 1 |

*15.*

| | | | | |
|---|---|---|---|---|
| Schoepf Robert Christian p.c. 280365-18026 | Executive Board | 06.11.2019 | 06.11.2019 | Jointly with at least {withAtLeast} persons entitled to represent 1 |
| Svirčenkovs Jurijs p.c. 210165-10658 | Executive Board | 29.04.2019 | 29.04.2019 | Jointly with at least {withAtLeast} persons entitled to represent 1 |
| Ulmans Boriss p.c. 050377-11213 | Supervisory Board | 28.04.2022 | 28.04.2022 | |
| Gasels Jefims p.c. 211186-10705 | Supervisory Board | 28.04.2022 | 28.04.2022 | |
| Kajems Biomins p.c. 071248-11238 | Supervisory Board | 28.04.2022 | 28.04.2022 | |
| Kozlova Jūlija p.c. 211263-12708 | Supervisory Board | 28.04.2022 | 28.04.2022 | |

**Beneficial owners**

| Person data | Date from | Registered on |
|---|---|---|
| Ulmans Mihails p.c. 120653-11239 Country of residence: Latvia Citizenship: Latvia | 12.03.2018 | 12.03.2018 |

**Control type:** on grounds of the property right

1.
Sabiedrība ar ierobežotu atbildību "Mono"
Reg. Num.: 40003004625
Legal address: Rīga, Katlakalna iela 1

| Person data | Date from | Registered on |
|---|---|---|
| | | |

16.

| Plotkin Aleksandr<br>p.c. 051159-14666<br>Country of residence: Latvia<br>Citizenship: United States of America | 12.03.2018 | 12.03.2018 |

**Control type:** on grounds of the property right

1.
Sabiedrība ar ierobežotu atbildību "Mono"
Reg. Num.: 40003004625
Legal address: Rīga, Katlakalna iela 1

## Reorganization

| Change of legal form | From "Sabiedrība ar ierobežotu atbildību (limited liability company)" to "Akciju sabiedrība (public limited company)" |
| --- | --- |
| Date | 25.09.2008 |

Information is true and reliable, and corresponds to entries of the registers kept by the Enterprise Register of the Republic of Latvia and other registered information

www.ur.gov.lv          Phone number: 67 031 703          Email: pasts@ur.gov.lv

https://info.ur.gov.lv/#/legal-entity/50103189561

17.

# ANNEX 2



Lieta Nr.C30753819
Lietas arhīva Nr.CA-0380-21/15
ECLI:LV:RAT:2021:0225.C30753819.9.S

# SPRIEDUMS

**Latvijas Republikas vārdā**

2021.gada 25.februārī

Rīgas apgabaltiesas Civillietu tiesas kolēģija šādā sastāvā:

tiesnese referente I. Ozola, tiesneši M. Šķendere un J. Freimanis

izskatīja rakstveida procesā Rīgā, Brīvības bulvārī 34, civillietu Mihaila Uļmana prasībā pret Kristapu Bunkus, Ojāru Bunkus, Kasparu Bunkus un Daci Bunkus par goda un cieņu saturošu ziņu atsaukšanu un mantiskās kompensācijas piedziņu sakarā ar Mihaila Uļmana apelācijas sūdzību par Rīgas pilsētas Vidzemes priekšpilsētas tiesas 2020.gada 12.oktobra spriedumu.

### Aprakstošā daļa

[1] Mihails Uļmans 2019.gada 9.septembrī cēlis Rīgas pilsēta Vidzemes priekšpilsētas tiesā prasību, kura vēlāk grozīta, pret Kristapu Bunkus, Ojāru Bunkus, Kasparu Bunkus un Daci Bunkus par goda un cieņu saturošu ziņu atsaukšanu un mantiskās kompensācijas piedziņu, kurā lūgts:

- Noteikt, ka Kristapam Bunkus, Ojāram Bunkus, Dacei Bunkus, un Kasparam Bunkus jāapmaina 2019.gada 28.marta atbilde uz maksātnespējīgās SIA "Rego Trade" administratora Kaspara Novicāna un Mihaila Uļmana pretenzijām, izslēdzot no tās tekstu "mantiniekiem ir zināms, ka visus šos gadus, kamēr Mārtiņš Bunkus ir bijis administrators MSIA "Rego Trade" maksātnespējas procesā, M.Uļmans ir mēģinājis piespiest administratoru Mārtiņu Bunkus atteikties no visām prasībām pret viņu, tajā skaitā, Mārtiņam Bunkus tika izteikti draudi, tostarp draudi safabricēt pret viņu krimināllietas, iesaistot augsta ranga amatpersonas, ar kuriem lielījies

M.Uļmans";

- Piedzīt solidāri no Kristapa Bunkus, Ojāra Bunkus, Daces Bunkus un Kaspara Bunkus mantisko kompensāciju par goda un cieņas prettiesisku aizskārumu 10 000 EUR.

[2] Atbildētāja Dace Bunkus rakstveida paskaidrojumos uzskata, ka prasība ir pilnībā nepamatota un tādēļ noraidāma. Nav izplatītas godu un cieņu aizskarošas ziņas.

Prasītājs atsaucas uz atbildi un pretenziju, kas nosūtīta maksātnespējas administratoram, kas ir valsts amatpersona, privāttiesiska strīda starp pusēm ietvaros. Puses norādīšana uz kādiem apstākļiem strīda ietvaros nav uzskatāma par ziņu izplatīšanu. Proti, puses paskaidrojumi tiesai, neatkarīgi no tā, vai tie tiek sniegti mutiski tiesas sēdē vai rakstveidā nav uzskatāmi par ziņu izplatīšanu. Ja tiesā iesniegta civilprasība bez pierādījumiem par prettiesiskas rīcības konstatēšanu kriminālprocesuālā kārtībā, pieteikums civillietā nav pakļauts tiesas izskatīšanai.

Atbilde uz pretenziju ir pielīdzināma puses paskaidrojumiem, jo ir nosūtīta otrai pusei, šajā gadījumā arī valsts amatpersonai- maksātnespējas administratoram, nevis izplatīta publiski, turklāt strīda ietvaros pirmstiesas procesā.

To pierāda tas, ka 2019.gada 20.marta atbilde uz 2018.gada 10.septembra kreditora pretenziju, kurā ir ietverts teksts, par kuru ir celta prasība, lai arī sākotnēji nosūtīta maksātnespējas administratoram, šobrīd ir iesniegta civillietas Nr.C30762319 materiālos, kas papildu apliecina, ka runa šeit iet tikai un vienīgi par strīdu starp pusēm, nevis ziņu izplatīšanu.

Kompensācijas apmērs nav pamatots.

Atbildētāju rīcībā vispār pēc būtības nav konstatējama godu un cieņu aizskarošu ziņu izplatīšana, kas pats par sevi izslēdz tiesības saņemt atlīdzinājumu. Prasītājs nekādā veidā nav pamatojis pieprasītās kompensācijas apmēru.

Nepastāv solidāra saistība starp atbildētājiem. Prasītājs nav nekādā veidā pamatojis, uz kāda pamata rodas solidāra saistība.

[3] Atbildētājs Ojārs Bunkus rakstveida paskaidrojumos prasību neatzīst, uzskata to par nepamatotu un noraidāmu pilnā apmērā, jo nav izplatījis nepatiesas ziņas.

Ojārs Bunkus paskaidro, ka dēls Mārtiņš Bunkus tēvam vairākkārt teicis, ka viņam saistībā ar pienākumu veikšanu MSIA "Rego Trade" maksātnespējas procesā ir izteikti draudi un viņa dzīvība esot apdraudēta.

Dēls teicis, ka M.Uļmana uzdevumā attiecībā pret viņu var tikt pielietota vardarbība un fiziska izrēķināšanās.

[4] Atbildētāji Ojārs Bunkus, Kaspars Bunkus un Kristaps Bunkus rakstveida paskaidrojumos prasību neatzīst un uzskata to par nepamatotu un noraidāmu.

Norāda, ka zvērināts advokāts un maksātnespējas administrators Mārtiņš Bunkus bija

2

atbildētāju brālis un dēls, kas ar atbildētājiem bieži apspriedās ne tikai par sadzīves un ģimenes jautājumiem, bet arī stāstīja par saviem pārdzīvojumiem. Šādā veidā atbildētājiem bija kļuvis zināms par Mārtiņa Bunkus un prasītāja savstarpējām attiecībām. Mārtiņš Bunkus informēja atbildētājus, ka viņam tika izteikti draudi, tostarp draudi safabricēt pret viņu krimināllietu.

Ar Rīgas pilsētas Latgales priekšpilsētas tiesas 2008.gada 24.aprīļa spriedumu pasludināts MSIA "Rego Trade" maksātnespējas process. Par parādnieka administratoru iecelts maksātnespējas procesa administrators Mārtiņš Bunkus. Par parādnieka pārstāvjiem maksātnespējas procesā iecelti parādnieka bijušie valdes locekļi, tajā skaitā, prasītājs.

Pildot pienākumus parādnieka maksātnespējas procesā, Mārtiņam Bunkus radās aizdomas, ka parādnieks varētu būt apzināti novests līdz maksātnespējai. Mārtiņš Bunkus atklāja, ka parādnieka valdes locekle S.Lučina ir bijusi persona bez noteiktas dzīvesvietas, kas nebija informēta, ka ir parādnieka valdes locekle un nebija parakstījusi nevienu no parādnieka dokumentiem, uz kuriem it kā bija viņas paraksts. Tāpat Mārtiņam Bunkus radās aizdomas, ka parādnieka kapitāla daļu īpašniece ofšora sabiedrība Avacon association INC, kas bija S.Lučinu pret pašas gribu iecēlusi par parādnieka valdes locekli, iespējams, pieder prasītājam. Tika konstatēts, ka ar parādnieka naudas līdzekļiem ir veikts SIA "Fishland" kapitāla daļu pirkuma darījums, kurā dokumentus parādnieka vārdā it kā parakstījusi S.Lučina. rezultātā parādnieks iegādājās kapitāldaļas SIA "Fishland", ieceļot par valdes locekli Nataļju Mihailovu. SIA "Fishland" dalībnieku sapulcē, kurā tika izlemts minētais jautājums, it kā ir piedalījusies S.Lučina un Iļģuciema cietumā esošā persona N.Mihailova. Vēlāk ar ekspertīzi atklāts, ka N.Mihailovas paraksti uz dokumentiem, kas iesniegti Uzņēmumu reģistrā, bija viltoti. Parādniekam šī darījuma rezultātā radās saistības 250 000 Ls apmērā.

Līdz ar to Mārtiņš Bunkus parādnieka vārdā cēla vairākas prasības, tostarp, arī pret prasītāju kā parādnieka bijušo valdes locekli, par zaudējumu un segtā parāda piedziņu, kā arī informēja tiesībaizsardzības iestādes par iespējamu prettiesisku rīcību. Pamatojoties uz Mārtiņa Bunkus iesniegumiem, uzsākts kriminālprocess par parādnieka tīšu novešanu līdz maksātnespējai, kriminālprocess par šķēršļu likšanu parādnieka maksātnespējas procesā. Bet pirms parādnieka maksātnespējas procesa pasludināšanas, pamatojoties uz nodrošinātā kreditora AS "PNB Bank" iesniegumu uzsākts kriminālprocess par parādnieka ieķīlātās mantas atsavināšanu bez ķīlas ņēmēja atļaujas.

Pēc tam, kad ar Augstākās tiesas Civillietu tiesu palātas 2012.gada 23.februāra spriedumu nolemts piedzīt no prasītāja par labu parādniekam 377 954, 96 EUR, Mārtiņam Bunkus (kā viņš informēja atbildētājus) sāka izteikt draudus, mēģinot panākt tiesvedības izbeigšanu ar prasītāju saistītajās civillietās.

3

Draudu izteikšanu, to būtību un apstākli, cik ļoti Mārtiņš Bunkus šo draudu izteikšanas rezultātā baidījās par savu veselību un dzīvību, apliecina apstāklis, ka Mārtiņš Bunkus par draudu izteikšanu vairākkārt informēja tādas tiesību aizsardzības iestādes kā Latvijas Republikas Ģenerālprokuratūru un Korupcijas novēršanas un apkarošanas biroju. No minētajās iestādēs esošajiem lietu materiāliem ir redzams Mārtiņa Bunkus teiktais par viņam izteiktajiem draudiem, draudu būtību un draudu mērķi.

Savukārt, ar Rīgas pilsētas Latgales priekšpilsētas tiesas 2016.gada 28.janvāra sēdes ierakstu civillietā un Rīgas pilsētas Latgales priekšpilsētas tiesas 2016.gada 4.februāra lēmumu ir pierādīts, ka kāda persona mēģinājusi prasītāja labā risināt lietu ārpus tiesas zāles vienojoties ar tiesnesi. Šajā lietā tiesai bija jāizšķir jautājums par 2015.gada 30.novembra parādnieka kreditora sapulces nolemto turpināt tiesvedības pret prasītāju, kā arī turpināt kriminālprocesus un neatteikties no cietušā statusa.

No Mārtiņa Bunkus 2016.gada 18.jūlija paskaidrojumiem Korupcijas novēršanas un apkarošanas birojam izriet, ka Mārtiņš Bunkus kopš 2012.gada sakarā ar domstarpībām ar prasītāju par parādnieka maksātnespējas procesu bija spiests dzīvot iespaidošanas mēģinājumu un draudu ietekmē, baidoties no nepamatotu kriminālprocesu pret viņu ierosināšanas, kā arī baidoties par savu veselību un dzīvību. Apstākli, ka draudus "safabricēt kriminālprocesus" un draudus savai veselībai un dzīvībai Mārtiņš Bunkus uztvēra ļoti nopietni, apliecina apstāklis, ka viņš vairākkārt par tiem informēja tiesībsargājošās iestādes,

2018.gada 30.maijā pret Mārtiņu Bunkus īstenots bruņots uzbrukums, un viņš nežēlīgi nogalināts.

No 2018.gada 27.jūnija par parādnieka maksātnespējas procesa administratoru iecelts Kaspars Novicāns, kurš, atbildētāju ieskatā, atšķirībā no Mārtiņa Bunkus, ir izvēlējies rīkoties atbilstoši prasītāja interesēm.

Minēto netieši pierāda arī apstāklis, ka Mārtiņa Bunkus mantojuma lietā 2018.gada septembrī pieteiktas divas gandrīz identiskas kreditoru pretenzijas – viena no prasītāja, bet otra no K.Novicāna kā parādnieka maksātnespējas procesa administratora. Tā kā abi kreditoru prasījumi pēc būtības bija identiski, uz tiem 2019.gada 20.martā sagatavota viena atbilde.

Atbildot uz prasītāja un parādnieka administratora prasību atmaksāt mirušajam Mārtiņam Bunkus no parādnieka naudas līdzekļiem, it kā nepamatoti izmaksāto atlīdzību, atbildētāji norādīja, ka Mārtiņš Bunkus vairs nevar ietekmēt uzsāktās tiesvedības rezultātu. Līdz ar to tikai no jaunā parādnieka administratora profesionalitātes un spējas neatkarīgi pārstāvēt parādnieka intereses ir atkarīgs, vai Mārtiņa Bunkus atgūtie naudas līdzekļi paliks parādnieka rīcībā. Šajā kontekstā, aizstāvoties pret prasītāja un parādnieka administratora kā valsts

4

amatpersonas nepamatotajiem prasījumiem, minēts, ka Mārtiņa Bunkus mantinieki ir informēti par Mārtiņa Bunkus dzīvi ar parādnieka maksātnespējas procesu un pret iepriekš minēto ierosināto kriminālprocesu un celto civilprasību saistīto draudu ietekmē. Apstākli, ka Mārtiņš Bunkus par ar parādnieka maksātnespējas procesa administrēšanu saistītajiem draudiem bija informējis pat tiesībsargājošās iestādes, apliecina pierādījumi.

Atbildētāji uzskata, ka nav izplatītas ziņas par prasītāju, tās nav izplatītas publiski, un nav aizskarts prasītāja gods un cieņa, kā rezultātā nav pamata kompensācijas piedziņai no atbildētājiem.

[5] Ar Rīgas pilsētas Vidzemes priekšpilsētas tiesas 2020.gada 12.oktobra spriedumu nospriests prasību noraidīt pilnīgi.

[5.1] Tiesa konstatējusi, ka 2019.gada 20.martā atbildētāji nosūtījuši MSIA "Rego Trade" administratoram K.Novicānam un prasītājam atbildi uz kreditoru pretenzijām, norādot, ka atbildētāji, būdami Mārtiņa Bunkus mantinieki, pieteiktās kreditoru pretenzijas neatzīst pilnībā. Minētā dokumenta otrās lapas piektajā rindkopā iekļauts šāds teksts: "[..] mantiniekiem ir zināms, ka visus šos gadus, kamēr Mārtiņš Bunkus ir bijis administrators MSIA "Rego Trade" maksātnespējas procesā, M.Uļmans ir mēģinājis piespiest administratoru Mārtiņu Bunkus atteikties no visām prasībām pret viņu, tajā skaitā, Mārtiņam Bunkus tika izteikti draudi, tostarp draudi safabricēt pret viņu krimināllietas, iesaistot augsta ranga amatpersonas, ar kuriem lielījies M.Uļmans" (turpmāk arī – izteikums).

[5.2] Tiesa atsaukusies uz tiesu praksi, ka pamats piemērot civiltiesisko aizsardzību saskaņā ar Civillikuma 2352.[1] pantu rodas, ja par personu ir izplatītas nepatiesas, godu un cieņu aizskarošas ziņas. Tātad, lai konstatētu šīs normas tiesisko sastāvu, tiesai, pirmkārt, ir jākonstatē, ka noteikta informācija ir izplatīta publiski, nevis aizskartajai personai izteikta privāti. Otrkārt, tiesai jāpārliecinās, ka prasījums attiecas uz publiski izplatītām ziņām, nevis uz viedokli. Treškārt, tiesai jānovērtē, vai izplatītās ziņas ir prasītāja godu un cieņu aizskarošas. Ceturtkārt, ir jānoskaidro, vai ziņu izplatītājs nevar pierādīt, ka šīs ziņas ir patiesas (*Tiesu prakses apkopojums "Goda un cieņas civiltiesiskā aizsardzība"(2000.-2018.), Augstākā tiesa, 4.lpp.*).

Ziņas ir datu, faktu, skaitļu un arī informācijas kopums. Savukārt viedoklis ir uzskats, izpratne (par ko), arī attieksme (pret ko). Viedoklis kā subjektīvs vērtējums var veidoties kā no patiesiem faktiem, tā kļūdainām ziņām, nepatiesas informācijas, un tas nav pierādāms (*Augstākās tiesas Senāta 2002.gada 8.maija spriedums lietā Nr.SKC-261/2002; Augstākās tiesas 2015.gada 24.septembra spriedums lietā Nr. SKC-204/2015; 2017.gada 6.marta spriedums lietā Nr. SKC- 98/2017; 2017.gada 6.marta spriedums lietā Nr.SKC-98/2017*). Tikai ziņas jeb fakti ir pakļaujami patiesības pārbaudei un to pastāvēšana var tikt pierādīta, turpretī

23.

viedoklis atspoguļo personas subjektīvo vērtējumu par kādu personu, tās darbību vai kādu notikumu un nevar būt ne patiess, ne nepatiess (*Augstākās tiesas Senāta 2011.gada 9.februāra spriedums lietā Nr.SKC-60*).

Lai konstatētu, vai izteikums atbilst jēdzienam "ziņas" vai "viedoklis", ir jāanalizē konfliktsituācijas apstākļi, konkrēto izteikumu saturs un konteksts, kā arī citi kritēriji, tostarp, kāds ir bijis atbildētājas mērķis, lietojot šādus izteikumus. Tādējādi noteicošie kritēriji ir: 1) izteikumu kopējais konteksts; 2) nozīme, ko šādam izteikumam varētu piešķirt neitrāla persona; 3) izteikuma autora skaidrojumi (*Augstākās tiesas 2015.gada 24.septembra spriedums lietā Nr.SKC-204/2015*).

[5.3] Izvērtējusi 2019.gada 20.marta atbildes saturu, kā arī ņemot vērā situāciju, kādā šis dokuments sagatavots, tiesa uzskatījusi, ka nav pamata apstrīdēto izteikumu atzīt par publiski izplatītām ziņām, kas neatbilst patiesībai un aizskar prasītāja godu un cieņu.

No Lursoft informācijas tiesa secinājusi, ka no 2008.gada 6.maija līdz nāves dienai Mārtiņš Bunkus pildīja administratora pienākumus MSIA "Rego Trade" maksātnespējas procesā. No 2018.gada 19.jūlija MSIA "Rego Trade" administratora pienākumus veic K.Novicāns.

No Rīgas apgabaltiesas 2018.gada 30.augusta lēmuma civillietā Nr.C04268909 un MSIA "Rego Trade" prasības pieteikuma civillietā Nr.C30762319 redzams, ka Mārtiņš Bunkus MSIA "Rego Trade" labā cēlis prasību pret Mihailu Uļmanu par parāda piedziņu, un prasību par zaudējumu piedziņu.

No atbildētāju iesniegtajiem pierādījumiem tiesa secinājusi, ka 2016.gadā Mārtiņš Bunkus vairākkārt informējis tiesībaizsardzības iestādes par tiem apstākļiem un notikumiem, kas Mārtiņam Bunkus deva pamatu uzskatīt, ka prasītājs mēģina piespiest administratoru atteikties no celtajām prasībām, kā arī norādot uz administratoram šajā sakarā pastarpināti izteiktajiem draudiem, tostarp draudiem safabricēt pret viņu krimināllietas, iesaistot augsta ranga amatpersonas, jo, kā norādījis Mārtiņš Bunkus, prasītājs savu paziņu lokā lielījies ar ļoti tuvām attiecībām ar dažādu tiesībaizsardzības iestāžu augstākām amatpersonām.

No Rīgas pilsētas Latgales priekšpilsētas tiesas 2016.gada 28.janvāra sēdes audioieraksta un 2016.gada 4.februāra lēmuma lietā Nr.C29352916 izriet, ka kāda persona, kas, iespējams, bija saistīta ar prasītāju, mēģināja ārpus tiesas sēdes pārrunāt ar tiesnesi konkrētās lietas un MSIA "Rego Trade" maksātnespējas lietas apstākļus. No Tiesu informatīvās sistēmas tiesa secinājusi, ka minētajā lietā skatīta prasītāja un citu personu sūdzība par MSIA "Rego Trade" 2015.gada 30.novembra kreditoru sapulcē pieņemtajiem lēmumiem, tostarp lēmumu par tiesvedības turpināšanu civillietā Nr.C04268909.

24.

[5.4] Ņemot vērā atbildētāju un Mārtiņa Bunkus radniecību, tiesa uzskatījusi, ka nav pamata apšaubīt atbildētāju norādītos apstākļus, ka Mārtiņš Bunkus varēja stāstīt ģimenes locekļiem par konfliktsituāciju ar prasītāju, kā arī par savām aizdomām un pārdzīvojumiem šajā sakarā.

Ka Mārtiņa Bunkus pārdzīvojumi bija reāli, tiesa secinājusi no dokumentiem, kurus viņš 2016.gadā iesniedzis Ģenerālprokuratūrā un Korupcijas novēršanas un apkarošanas birojā.

Tiesa ņēmusi vērā Augstākās tiesas atziņas, ka subjektīvās aizdomas, kas izteiktas trešajai personai, nevar tikt kvalificētas kā ziņu izplatīšana, bet gan par personīgo viedokli, un tas nav atzīstams par ziņu izplatīšanu un tādēļ nevar prasīt to atsaukšanu (*Augstākās tiesas Senāta 2013. gada 31. maija spriedums lietā Nr.SKC-250/2013*). Tādējādi, ja šādas aizdomas bija Mārtiņam Bunkus, par ko viņš informēja tiesībaizsardzības iestādes, tad atbildētājiem uz šo aizdomu pamata varēja izveidoties analoģisks priekšstats par prasītāju un konfliktsituāciju kopumā.

[5.5] Tiesa konstatējusi, ka frāze, kura ietver apstrīdēto izteikumu, formulēta šādi: "Civillietas Nr.C04268909 iznākums turpmāk ir atkarīgs tieši no administratora rīcības un profesionalitātes, it sevišķi pie apstākļiem, kad mantiniekiem ir zināms, ka visus šos gadus, kamēr Mārtiņš Bunkus ir bijis administrators MSIA "Rego Trade" maksātnespējas procesā, M.Uļmans ir mēģinājis piespiest administratoru Mārtiņu Bunkus atteikties no visām prasībām pret viņu, tajā skaitā, Mārtiņam Bunkus tika izteikti draudi, tostarp draudi safabricēt pret viņu krimināllietas, iesaistot augsta ranga amatpersonas, ar kuriem lielījies M.Uļmans".

No dokumenta satura tiesa secinājusi, ka atbildētājiem radās aizdomas, ka maksātnespējas administrators K.Novicāns nerīkojas atbilstoši Maksātnespējas likuma normām, bet rīkojas prasītāja interesēs, veicot tās darbības, kuras, atbildētāju ieskatā, prasītājs gribēja panākt tajā laikā, kad par MSIA "Rego Trade" administratoru bija Mārtiņš Bunkus. Norādot, ka civillietas Nr.C04268909 iznākums turpmāk ir atkarīgs tieši no administratora rīcības un profesionalitātes, atbildētāji tādējādi pauž cerību, ka jaunais administrators rīkosies profesionāli, nepakļaujoties nekādai ietekmei un spiedienam, pie apstākļiem, kad šāds spiediens, atbildētāju vērtējumā, ņemot vērā viņu rīcībā esošo informāciju, izdarīts uz iepriekšējo administratoru.

Turpmākajā tekstā atbildētāji pauž neapmierinātību ar jaunā administratora jau veiktajām darbībām MSIA "Rego Trade" maksātnespējas procesā, administratoram rīkojoties pretēji tam, kā iepriekš rīkojās Mārtiņš Bunkus, kas deva atbildētājiem pamatu uzskatīt, ka prasītājam jaunā administratora rīcības rezultātā ir nodrošinātas iespējas atteikties no prasības, kas ir celta pret prasītāju.

Lai arī apstrīdētais izteikums tiek lietots kategoriskā formā: "mantiniekiem ir zināms", tiesa uzskatījusi, ka šāds formulējums faktiski atspoguļo atbildētāju priekšstatu par prasītāju un

konfliktsituāciju starp prasītāju un Mārtiņu Bunkus, kas izveidojās, ņemot vērā atbildētāju rīcībā esošo informāciju par Mārtiņa Bunkus aizdomām un pārdzīvojumiem, viņa vēršanos tiesībaizsardzības iestādēs, kā arī notikumiem lietā Nr.C29352916. Tiesa secinājusi, ka izteikums uzskatāms par atbildētāju viedokli, kas balstīts uz faktisko bāzi.

Lietā nav konstatēts, ka, iekļaujot apstrīdēto izteikumu 2019.gada 20.marta vēstulē, atbildētāji būtu darbojušies ļaunā ticībā vai viņu nolūks bija jebkādā veidā nomelnot prasītāju. Pastāvot strīdam starp mantiniekiem un kreditoriem, savā atbildē uz kreditoru pretenzijām atbildētāji vairākkārt brīdina administratoru, ka jebkādi zaudējumi, kas tiks nodarīti mantiniekiem, administratoram veicot darbības, kas ir pretrunā ar tiesību normām, tiks piedzīti personiski no administratora. Līdz ar to secināms, ka apstrīdētais izteikums iekļauts atbildē, lai tādējādi mudinātu administratoru rīkoties profesionāli, atbilstoši Maksātnespējas likuma normām, nevis prasītāja interesēs, kā to interpretēja atbildētāji.

[5.6] Tiesa atsaukusies uz atziņām tiesu praksē, ka gods un cieņa ir atzīstama par aizskartu, ja tiek konstatēts, ka ziņu, kas neatbilst patiesībai, izplatīšanas rezultātā sabiedriskais vērtējums par personu ir samazinājies un vērtējuma atspoguļojums paša cietušā apziņā ir pazeminājies (*Augstākās tiesas Senāta 2012. gada 1. februāra paplašinātā sastāva spriedums lietā Nr. SKC 8/2012*). Saskaņā ar Civillikuma 2352.[1] panta pirmo daļu atbildība iestājas arī par nepamatota un aizskaroša viedokļa paušanu bez jebkādas faktiskas bāzes, tas ir, gadījumos, kad viedoklis ir rupjš un klaji aizskarošs (*Senāta 2019.gada 10.jūlija spriedums lietā Nr.SKC-40/2019*).

Tiesa ņemot vērā, ka atbildētāju viedokļa pamatā bija faktiskā bāze, uzskatījusi, ka nav pietiekama pamata atzīt, ka šis viedoklis ir rupjš vai klaji aizskarošs.

Tiesa secinājusi, ka nav konstatēts, ka prasītāja novērtējums MSIA "Rego Trade" administratora K.Novicāna acīs būtu pasliktinājies, jo, kā secināms no prasītāja paskaidrojumiem, prasītājs ar administratoru nav sazinājies saistībā ar 2019.gada 20.marta atbildi uz kreditoru pretenzijām. Nekonstatējot nepatiesu ziņu izplatīšanu un tāda viedokļa paušanu, kam nebija nekāda pamatojuma, tiesa secinājusi, ka nav arī pamata mantiskās kompensācijas piedziņai atbilstoši Civillikuma 2352.[1] pantam. Līdz ar to tiesa nav vērtējusi kompensācijas apmēru.

[6] Prasītājs Mihails Uļmans iesniedzis apelācijas sūdzību par spriedumu pilnā apjomā.

[6.1] Norāda, ka tiesas uzdevums nepārprotami bija noskaidrot vai nepatiesās ziņas, kuras prasītājs prasa atsaukt, ir ziņas.

Tiesa atbildētāju apgalvotu faktu par Mihaila Uļmana rīcību (lielīšanās formā izteikti draudi realizēt prettiesisku darbību pret Mārtiņu Bunkus ar sev paklausīgu amatpersonu iesaistīšanu) pielīdzina viedoklim (izpratnei/attieksmei), kas atbrīvo atbildētājus no sava

apgalvojuma patiesuma pierādīšanas pienākuma. Nav iespējams pielīdzināt viedoklim apgalvojumā ietvertu faktu par personas rīcību. Ziņu par viedokli nevar padarīt arī ar šo ziņu nesaistīts negatīvas informācijas apjoms par prasītāju.

[6.2] Ar konkrētu ziņu nesaistīts negatīvas informācijas apjoms par personu nerada tiesības citai personai izplatīt nepatiesas ziņas. Ja lietā par būtisku ir uzskatāms Mārtiņa Bunkus un Mihaila Uļmana attiecību jautājums SIA "Rego Trade" maksātnespējas procesa ietvaros, tad šis jautājums nav noskaidrojams no Mārtiņa Bunkus subjektīvā viedokļa, kurš izteikts viņa iesniegumos Ģenerālprokuroram un Korupcijas novēršanas un apkarošanas birojam, par kuru nepamatotību nevar pastāvēt strīds, jo tos izskatot nekādas nelikumības netika konstatētas.

Savukārt savas prasības 5.punktā Mihails Uļmans atsaucās uz Rīgas apgabaltiesas 2018.gada 30.augusta lēmumu, ar kuru nolemts atcelt Augstākās tiesas Civillietu tiesu palātas 2015.gada 26.oktobra spriedumu civillietā MSIA "Rego Trade" administratora prasībā pret Aleksandru Budovski, Danu Vapni, Mihailu Uļmanu un Diānu Vigmani un nodot lietu jaunai izskatīšanai Rīgas rajona tiesai. Šī tiesas lēmuma motīvu daļā konstatēts, ka "Līdz brīdim, kad atbildētāji iepazinās ar dokumentāciju, kas saņemta no Valsts policijas, viņi nezināja un nevarēja zināt, ka attiecīgā SIA „ Rego Trade" dokumentācija ir ne tikai saglabājusies, bet maksātnespējīgās MSIA „ Rego Trade" administrators Mārtiņš Bunkus šo faktu ir noslēpis un maldinājis tiesu un "Attiecīgi izskatāmās lietas tiesvedības laikā no 2009.gada 17.jūnija, kad ierosināta civillieta, līdz sprieduma pasludināšanai 2015.gada 26.oktobrī, grāmatvedības dokumenti, tajā skaitā pavadzīmes, uz kurām atsaucās atbildētāji, atradās MSIA „ Rego Trade" administratora rīcībā, taču MSIA „ Rego Trade" administrators šādu faktu noliedza, tiesvedības gaitā vairākkārt norādot, ka nekādi grāmatvedības dokumenti no atbildētājiem nav saņemti". Šādā kontekstā vērtējot Mārtiņa Bunkus 2016.gada 8.februāra iesniegumā Ģenerālprokuroram norādīto, ir konstatējama apgalvojuma liekulība.

Mārtiņš Bunkus nebaidījās, ka M.Uļmana uzdevumā attiecībā pret viņu var tikt pielietota vardarbība un fiziska izrēķināšanās, bet baidījās tikt pieķerts informācijas slēpšanā, lai panāktu sev ārkārtīgi finansiāli izdevīgu tiesas spriedumu par 721 186,20 EUR piedziņu no Mihaila Uļmana. Tādējādi sprieduma motīvu daļā 5.lpp. 4.rindkopā tiesas atzītie no iesniegumos Ģenerālprokuroram un Korupcijas novēršanas un apkarošanas birojam konstatētie Mārtiņa Bunkus reālie pārdzīvojumi visdrīzāk ir pilnīgi cita rakstura (bažas par nepamatoti iegūtas ievērojamas atlīdzības zaudēšanu nevis drošības apdraudējums).

Tiesas spriedumā Rīgas apgabaltiesas 2018.gada 30.augusta lēmums nav pat pieminēts, un tādējādi, vērtējot Mārtiņa Bunkus un Mihaila Uļmana attiecību jautājumu SIA „ Rego Trade" maksātnespējas procesa ietvaros, tiesa spriedumā nav ievērojusi Civilprocesa likuma 97.panta

9

trešās daļas prasības par pierādījumu novērtēšanu.

Šādā kontekstā kritiski būtu vērtējams tajā pat laikā (2016.gada 8.marta un 2016.gada 18.jūlija paskaidrojumos Korupcijas novēršanas un apkarošanas birojam) norādītais par aizdomām un neizpaužamu "M.Uļmanam pietuvinātu personu lokā" izplatīto informāciju par draudiem atriebties Mārtiņam Bunkus, tajā skaitā, ar uzpirktu tiesībaizsardzības iestāžu amatpersonu iesaisti. Lai arī Mihails Uļmans nevar piekrist, ka viņam jāsamierinās ar savu tiesību aizskārumu, ja to izraisījis valsts amatpersonas Mārtiņa Bunkus saviem radiniekiem izplatītas dienesta informācijas fakts, viņam nav pamata apšaubīt tiesas uzskatu, ka valsts amatpersona Mārtiņš Bunkus saviem radiniekiem varēja stāstīt "par konfliktsituāciju ar prasītāju, kā arī par savām aizdomām un pārdzīvojumiem šajā sakarā". Tieši pretēji, Mihailam Uļmanam vienmēr ir bijušas aizdomas, ka Mārtiņš Bunkus savu mērķu sasniegšanai cieši sadarbojās ar savu brāli toreizējo Valsts ieņēmumu dienesta Maksātnespējas struktūrvienības vadītāju Kasparu Bunkus.

[6.3] Nepatiesu ziņu atsaukšanas pienākums nav atkarīgs no fakta vai ir pierādījumi, ka ar nepatiesu ziņu ir pasliktinājies prasītāja novērtējums ziņu adresāta acīs. Līdzšinējā tiesu prakse neliecina, ka šāda rakstura lietās tiek pratināti nepatieso ziņu adresāti jautājumā par viņu attieksmi pret saņemto ziņu. Ja tiesa uzskatīja, ka prasības pamatotības noteikšanai nepieciešams noskaidrot nepatiesās ziņas adresāta attieksmi, tiesas pienākums bija realizēt Civillikuma 93.panta ceturtajā daļā paredzēto paziņošanas procedūru, ko tiesa nav darījusi. Pat ja atbildētāju mērķis ar nepatiesu ziņu paušanu bija ietekmēt jaunā administratora rīcību, tas neattaisno nepatiesu ziņu paušanu.

[7] Ievērojot drošības pasākumus un izvērtējot apstākļus, ka lietu ir iespējams izskatīt rakstveida procesā, pamatojoties uz Covid-19 infekcijas izplatības pārvaldības likuma 10.pantu, 2020.gada 1.decembrī nolemts nozīmēt lietu izskatīšanai rakstveida procesā 2021.gada 10.februārī. Par to ar 2020.gada 1.decembra tiesas paziņojumu tiesa informējusi lietas dalībniekus un izskaidrojusi viņu tiesības.

[7.1] 2020.gada 1.decembrī Rīgas apgabaltiesā saņemti atbildētāju Ojāra Bunkus, Kristapa Bunkus, Kaspara Bunkus paskaidrojumi sakarā ar prasītāja apelācijas sūdzību.

2020.gada 2.decembrī minēto paskaidrojumu noraksti nosūtīti prasītāja Mihaila Uļmana pārstāvim zv.advokātam Aivaram Salmgriezim, atbildētājas Daces Bunkus pārstāvim zv.advokāta palīgam Kalvim Krūmiņam.

[7.2] 2021.gada 21.janvārī Rīgas apgabaltiesā saņemti prasītāja Mihaila Uļmana rakstveida paskaidrojumi.

2021.gada 25.janvārī minēto paskaidrojumu noraksti nosūtīti atbildētāju Ojāra Bunkus,

Kristapa Bunkus, Kaspara Bunkus pārstāvei zv.advokātei Anetei Bergmanei, atbildētājas Daces Bunkus pārstāvim zv.advokāta palīgam Kalvim Krūmiņam.

[7.3] Lūgumi, kuri attiektos uz konkrēto strīdu un būtu šķērslis lietu izskatīt rakstveida procesā, tiesas noteiktajā termiņā (līdz 2021.gada 27.janvārim) nav iesniegti.

Civillietu tiesas kolēģija atzīst, ka pastāv pamats sprieduma taisīšanai.

## Motīvu daļa

[8] Novērtējusi lietas dalībnieku paskaidrojumus kopsakarā ar pierādījumiem lietā, apsvērusi apelācijas sūdzības argumentus, pamatojoties uz apstākļiem, kas nodibināti ar pierādījumiem lietā, Civillietu tiesas kolēģija uzskata, ka prasība ir noraidāma.

Saskaņā ar Civilprocesa likuma 432.panta piekto daļu, ja tiesa, izskatot lietu, atzīst, ka zemākās instances tiesas spriedumā ietvertais pamatojums ir pareizs un pilnībā pietiekams, tā sprieduma motīvu daļā var norādīt, ka pievienojas zemākās instances tiesas sprieduma motivācijai. Šādā gadījumā šā likuma 193.panta piektajā daļā noteiktos apsvērumus sprieduma motīvu daļā var nenorādīt.

Civillietu tiesas kolēģija atzīst, ka pirmās instances tiesas spriedumā ietvertais pamatojums ir pareizs un pilnībā pietiekams, un pievienojas pirmās instances tiesas motivācijai spriedumā.

Saskaņā ar Civilprocesa likuma 426.panta pirmo daļu apelācijas instances tiesa izskata lietu pēc būtības sakarā ar apelācijas sūdzību [..] tādā apjomā, kā lūgts šajā sūdzībā.

[9] Saskaņā ar Civilprocesa likuma 430.panta trešo daļu fakti, kas konstatēti pirmās instances tiesā, apelācijas instances tiesā nav jāpārbauda, ja tie nav apstrīdēti apelācijas sūdzībā.

Apelācijas sūdzībā nav apstrīdēti pirmās instances tiesas konstatētie fakti, ka frāze, kas satur apstrīdēto izteikumu, formulēta 2019.gada 20.marta Mārtiņa Bunkus mantinieku Ojāra Bunkus, Daces Bunkus, Kaspara Bunkus, Kristapa Bunkus atbildē uz MSIA "Rego Trade" administratora Kaspara Novicāna 2018.gada 10.septembra kreditora pretenziju Nr.2-408/18 un 2018.gada 7.septembra kreditora pretenziju, šādi: "Civillietas Nr.C04268909 iznākums turpmāk ir atkarīgs tieši no administratora rīcības un profesionalitātes, it sevišķi pie apstākļiem, kad mantiniekiem ir zināms, ka visus šos gadus, kamēr Mārtiņš Bunkus ir bijis administrators MSIA "Rego Trade" maksātnespējas procesā, M.Uļmans ir mēģinājis piespiest administratoru Mārtiņu Bunkus atteikties no visām prasībām pret viņu, tajā skaitā, Mārtiņam Bunkus tika izteikti draudi, tostarp draudi safabricēt pret viņu krimināllietas, iesaistot augsta ranga amatpersonas, ar kuriem lielījies M.Uļmans." (lietas 10.lapa).

[9.1] Civillietu tiesas kolēģija turpmāk minēto apsvērumu dēļ nepiekrīt apgalvojumiem

29.

apelācijas sūdzībā [6.1], ka apstrīdētais izteikums ir ziņa.

Ziņas ir datu, faktu, skaitļu un arī informācijas kopums. Savukārt viedoklis ir uzskats, izpratne (par ko), arī attieksme (pret ko). Viedoklis kā subjektīvs vērtējums var veidoties kā no patiesiem faktiem, tā kļūdainām ziņām, nepatiesas informācijas, un tas nav pierādāms (*Augstākās tiesas Senāta 2002.gada 8.maija spriedums lietā Nr.SKC-261/2002; Augstākās tiesas 2015.gada 24.septembra spriedums lietā Nr. SKC-204/2015; 2017.gada 6.marta spriedums lietā Nr. SKC- 98/2017; 2017.gada 6.marta spriedums lietā Nr.SKC-98/2017*). Tikai ziņas jeb fakti ir pakļaujami patiesības pārbaudei un to pastāvēšana var tikt pierādīta, turpretī viedoklis atspoguļo personas subjektīvo vērtējumu par kādu personu, tās darbību vai kādu notikumu un nevar būt ne patiess, ne nepatiess (*Augstākās tiesas Senāta 2011.gada 9.februāra spriedums lietā Nr.SKC-60*).

Lai konstatētu, vai izteikums atbilst jēdzienam "ziņas" vai "viedoklis", ir jāanalizē konfliktsituācijas apstākļi, konkrēto izteikumu saturs un konteksts, kā arī citi kritēriji, tostarp, kāds ir bijis atbildētājas mērķis, lietojot šādus izteikumus. Tādējādi noteicošie kritēriji ir: 1) izteikumu kopējais konteksts; 2) nozīme, ko šādam izteikumam varētu piešķirt neitrāla persona; 3) izteikuma autora skaidrojumi (*Augstākās tiesas 2015.gada 24.septembra spriedums lietā Nr.SKC-204/2015*).

[9.2] Apelācijas sūdzībā nav apstrīdēts, ka izteikuma kopējais konteksts ir saistīts ar tādiem faktiskajiem lietas apstākļiem, kā Mārtiņa Bunkus un prasītāja ilgstošām domstarpībām par MSIA "Rego Trade" maksātnespējas procesu.

No 2008.gada 6.maija līdz nāves dienai Mārtiņš Bunkus pildīja administratora pienākumus SIA "Rego Trade" maksātnespējas procesā (lietas 89.-92.lapa).

[9.2.1] Nav pamata apšaubīt atbildētāju paskaidrojumos norādītos apstākļus, kuri apstiprinās arī ar informāciju Tiesu informatīvajā sistēmā, kurus nav apstrīdējis arī prasītājs, ka Mārtiņš Bunkus parādnieka SIA "Rego Trade" vārdā cēla vairākas prasības, tostarp arī pret Mihailu Uļmanu kā parādnieka bijušo valdes locekli par zaudējumu un segtā parāda piedziņu (civillieta Nr.C04268909, civillieta Nr.C04268309, Nr.C04268409), sakarā ar Mārtiņa Bunkus iesniegumu uzsākts kriminālprocess Nr.11514002509 par MSIA "Rego Trade" novešanu līdz maksātnespējai, kriminālprocess Nr.12814010208 par šķēršļu likšanu parādnieka maksātnespējas procesā, pirms parādnieka maksātnespējas procesa pasludināšanas, pamatojoties uz nodrošinātā kreditora AS "PNB Bank" iesniegumu, uzsākts kriminālprocess Nr.11517013008 par parādnieka ieķīlātās mantas atsavināšanu bez ķīlas ņēmēja atļaujas.

[9.2.2] Lietā noskaidrots, ka 2016.gada 8.februāra iesniegumā Ģenerālprokuroram Mārtiņš Bunkus norādījis: "[..] Kā arī man pastāv reālas bailes, ka M.Uļmana uzdevumā

12

*30.*

attiecībā pret mani var tikt pielietota vardarbība un fiziska izrēķināšanās, it īpaši šādas bailes man pastiprinājās pēc 2015.gada 26.oktobra Augstākās tiesas Civillietu tiesu palātas sprieduma, ar kuru no Mihaila Uļmana ir piedzīti 721 186, 20 EUR." (lietas 110.lapa).

2016.gada 8.marta paskaidrojumos Korupcijas novēršanas un apkarošanas birojam Mārtiņš Bunkus norādījis: " [..] Esmu saņēmis arī draudus un uz mani tika izdarīts spiediens, lai es izsniegtu pilnvaras pret M.Uļmanu ierosināto tiesvedību izbeigšanai un kriminālprocesa Nr.11514002509 par MSIA "Rego Trade" novešanu līdz maksātnespējai izbeigšanai. Tiku arī brīdināts, ka, ja šādas pilnvaras nedošu, tad man būs jārēķinās ar negatīvām sekām un problēmām ar tiesībaizsardzības iestādēm.

Taču neskatoties uz man izteiktajiem draudiem un izdarīto spiedienu, turpināju pildīt savus administratora amata pienākumus atbilstoši Maksātnespējas likumā noteiktajām prasībām [..]".

"[..]Uzreiz pēc šādu tiesas nolēmumu pasludināšanas M.Uļmana draudi tikai pastiprinājās. Man tika nodota informācija, ka M.Uļmans "sakārtos lietas", piesaistot amatpersonas plašākā mērogā un nodrošinās man problēmas. Savu paziņu lokā M.Uļmans lielās ar ļoti tuvām attiecībām ar dažādu tiesībaizsardzību iestāžu augstākām amatpersonām un izplata informāciju, ka šādām amatpersonām nauda jau ir nodota un problēmas ar tiesībaizsardzības iestādēm man ir garantētas, es tikšu atcelts no MSIA "Rego Trade" administratora amata un viņš kārtīgi atriebsies un izrēķināsies ar mani [..]." (lietas 94., 95.lapa).

2016.gada 18.jūlija paskaidrojumos Korupcijas novēršanas un apkarošanas birojam Mārtiņš Bunkus norādījis: "[..] Arī patreiz, 2015.gada beigās, pēc tam, kad 16.09.2015. Augstākā tiesa nolēma izskatīt manu kasācijas sūdzību par 1 333 131, 29 EUR piedziņu no M.Uļmana paplašinātā sastāvā, bet Augstākās tiesas Civillietu tiesu palāta 26.10.2015. pasludināja spriedumu par 721 186,20 EUR piedziņu, draudi no M.Uļmana tikai pastiprinājās. M.Uļmans sev tuvu personu lokā izplatīja informāciju, ka viņš man kārtīgi par šo atriebsies, viņš piesaistīs augsti stāvošas amatpersonas un problēmas ar tiesībaizsardzības iestādēm man būs garantētas, jo naudu viņš jau ir iedevis. M.Uļmanam tuvu stāvoša persona nodeva man šo informāciju, ko viennozīmīgi uztvēru kā draudus no M.Uļmana, kas tikuši izteikti pastarpināti, Šajā sakarā es griezos ar 08.02.2016. iesniegumu LR Ģenerālprokuratūrā [..].

[..] Draudus esmu saņēmis pastarpināti, proti, M.Uļmans savu pietuvinātu personu lokā izplatīja informāciju, ka "sakārtos lietas", piesaistot augsti stāvošās amatpersonas un nauda tiem jau ir iedota un problēmas ar tiesībaizsardzības iestādēm man ir garantētas, es tikšu atcelts no MSIA "Rego Trade" administratora amata un viņš kārtīgi atriebsies un izrēķināsies ar mani. Tāpat savu tuvu personu lokā M.Uļmans izplatīja informāciju, ka, ja es neatsaukšu tiesvedības

31.

pret viņu, tad mani un manu ģimenes locekļu apmelojošās kampaņas un publikācijas tiks turpinātas.

Šo informāciju viena no M.U|manam pietuvinātām personām ir nodevusi man. Šo informāciju uztvēru kā draudus no M.U|mana. Jau 2012.gada M.U|mana draudi radīt man problēmas ar tiesībaizsardzības iestādēm apstiprinājās, jo tie reāli tika īstenoti. Arī šajā gadījumā M.U|mana izteikti draudi reāli tika īstenoti. Minēto apstiprina tas, ka pēc tam, kad man tika nodota šāda informācija, saņēmu pavēsti ar aicinājumu ierasties policijā kriminālprocesā Nr.11514002312, kurā vairāk kā četrus gadus nekas netika darīts, un kuram sen jau bija jābūt izbeigtam saistībā ar noilgumu.

[..] M.U|mans arī īstenojis publiskas nomelnošanas kampaņas pret mani un maniem ģimenes locekļiem, izmantojot portāla www.pietiek.com pakalpojumus un apmaksājot tos. Arī tas apstiprina M.U|mana draudu nopietnību un viennozīmīgu nolūku šos draudus realizēt.

Arī tādas darbības, kad iespējams no M.U|mana notika mēģinājums piekukuļot Rīgas pilsētas Latgales priekšpilsētas tiesas tiesnesi K.Vintu-Kormu civillietā C29352916, tikai apstiprināja to, ka M.U|mana draudi ir reāli un šādu draudus viņš reāli arī īsteno.

Kā draudus uztvēru arī tādu gadījumu, kad sarunā ar man personīgi pazīstamu personu M.U|mana uzticamības persona cita starpā minēja par manu un MSIA "Rego Trade" lietu, norādot, ka vispār par šādiem līdzīgiem gadījumiem cilvēki mēdz būt nošauti kā tas kādreiz ir atgadījies ar M.U|mana partneri. Arī šādu M.U|mana uzticamības personas vēstījumu uztvēru kā ļoti nopietnus draudus man par to, ka M.U|mans neizslēdz iespēju arī fiziski izrēķināties ar mani. Spiediens tika izdarīts tādejādi, ka par mani tika sniegts neskaitāms daudzums izdomātu un nepamatotu sūdzību.

[..] Es vēlos paskaidrot, ka turpinu izjust draudus un satraukumu par to, ka draudu realizācija tiks turpināta. M.U|mans savus draudus reāli ir uzsācis izpildīt, gan piesaistot augsta ranga amatpersonu – iespējams A.Sozinovu, gan, iespējams pat mēģinot piekukuļot tiesu. Tika veikta manis un manu ģimenes locekļu publiskā nomelnošanas kampaņa. Katru dienu dzīvoju ar satraukumu par savu un savas ģimenes dzīvi un veselību. Ar vēstījumu, ka līdzīgos gadījumos cilvēki tiek nošauti, kā tas ir noticis ar M.U|mana partneri, man tika likts saprast, ka M.U|mans neizslēdz fizisko izrēķināšanos.

Tā kā M.U|mans jau ir uzsācis savus draudus realizēt, tad draudus vērtēju kā ļoti reālus un nopietnus. Tā kā nepakļaušos draudiem un spiedienam un turpināšu tiesvedības pret M.U|manu MSIA "Rego Trade" labā, kā to ir nolēmusi 30.11.2015. MSIA "Rego Trade" kreditoru sapulce, tad jūtos apdraudēts arī tagad, jo viss jau iepriekš notiekošais norāda uz to, ka M.U|mans neapstāsies un turpinās īstenot savus draudus, veikt amatpersonu uzpirkšanu, veikt manis un

14

32.

manu ģimenes locekļu publisku nomelnošanu, tāpat esmu satraucies arī par to, ka pēc M.Uļmana pasūtījuma notiks arī fiziskā izrēķināšanās ar mani." (lietas 100.-106.lapa).

[9.3] Ievērojot faktiskos apstākļus [9.2.1], kas norisinājās pirms apstrīdētā izteikuma ietveršanas 2019.gada 20.marta Mārtiņa Bunkus mantinieku Ojāra Bunkus, Daces Bunkus, Kaspara Bunkus, Kristapa Bunkus atbildē uz MSIA "Rego Trade" administratora Kaspara Novicāna kreditora pretenzijām, atbildētāju un Mārtiņa Bunkus radniecību, Civillietu tiesas kolēģijai nav pamata apšaubīt, ka Mārtiņš Bunkus varēja stāstīt ģimenes locekļiem par konfliktsituāciju ar prasītāju, kā arī par savām aizdomām un pārdzīvojumiem šajā sakarā, ka saistībā ar Mārtiņa Bunkus aizdomām arī atbildētājiem varēja izveidoties analoģisks priekšstats par prasītāju un konfliktsituāciju kopumā.

Civillietu tiesas kolēģija ņem vērā Augstākās tiesas atziņas, ka subjektīvās aizdomas, kas izteiktas trešajai personai, nevar tikt kvalificētas kā ziņu izplatīšana, bet gan par personīgo viedokli, un tas nav atzīstams par ziņu izplatīšanu un tādēļ nevar prasīt to atsaukšanu (*Augstākās tiesas Senāta 2013. gada 31. maija spriedums lietā Nr.SKC- 250/2013*). Tādējādi, ja šādas aizdomas bija Mārtiņam Bunkus, par ko viņš informēja tiesībaizsardzības iestādes [9.2.2], tad atbildētājiem uz šo aizdomu pamata varēja izveidoties analoģisks priekšstats par prasītāju un konfliktsituāciju kopumā.

[9.4] Tādejādi Civillietu tiesas kolēģija secina, ka apstrīdētais izteikums ir atbildētāju viedoklis, kas veidojies pēc Mārtiņa Bunkus teiktā par viņa negatīvo pieredzi ar prasītāju, viņa rīcību maksātnespējas procesa laikā, kā arī Mārtiņa Bunkus bailēm par savu dzīvību, kuru dēļ viņš vairākkārt vērsies tiesībaizsardzības iestādēs. Atbildētājiem radies viedoklis, ka prasītājs ir rīkojies Mārtiņa Bunkus aprakstītajā veidā, t.i. prasītājs aktīvi ar dažādām metodēm mēģinājis piespiest jeb pamudināt Mārtiņu Bunkus atteikties no MSIA "Rego Trade" vārdā celtajām prasībām.

[9.4.1] Tāpat atbildētājiem radās iespaids, ka Mārtiņam Bunkus izteiktie draudi, tostarp kaitēt viņa reputācijai, kā arī "safabricēt" pret viņu kriminālprocesus, t.i. rīkoties tā, lai pret Mārtiņu Bunkus tiktu uzsāktas krimināllietas, tika īstenoti, jo iestājās apstākļi, kurus nav apstrīdējis arī prasītājs, ka pēc 2012.gada 23.februāra sprieduma, ar kuru no prasītāja piedzīti 377 951,96 EUR, 2012.gada 1.martā prasītājs vērsies Valsts policijas Rīgas reģiona pārvaldes Kriminālpolicijas pārvaldē ar iesniegumu, kā rezultātā 2012.gada 12.martā pret Mārtiņu Bunkus uzsākts kriminālprocess Nr.11514002312 (lietas 94.lapa).

[9.5] Civillietu tiesas kolēģija uzskata, ka ir klaji prasītāja apgalvojumi apelācijas sūdzībā [6.2] par it kā patieso un it kā prasītājam zināmo Mārtiņa Bunkus baiļu iemeslu – tikt piekertam informācijas slēpšanā, lai panāktu sev finansiāli izdevīgu tiesas spriedumu par 721 186, 20 EUR

15

33.

piedziņu, jo par šādu pieņēmumu pamatotību pierādījumus prasītājs nav iesniedzis. Turklāt šādi prasītāja subjektīvi pieņēmumi Civillietu tiesas kolēģijas ieskatā nevar apgāzt pierādījumus, ka atbildētājiem bija pamats paļauties uz Mārtiņa Bunkus viedokli un pašiem izveidot savu viedokli, pamatojoties uz no Mārtiņa Bunkus saņemto informāciju.

[9.6] Nepamatots ir apelācijas sūdzībā [6.3] norādītais, ka nepatiesu ziņu atsaukšanas pienākums neesot atkarīgs no fakta, vai ir pierādījumi, ka ar nepatiesu ziņu ir pasliktinājies prasītāja novērtējums ziņu adresāta acīs.

Priekšnoteikums Civillikuma 2352.[1] panta, uz kuru arī prasība pamatota, piemērošanai attiecībā uz nepatiesu, godu un cieņu aizskarošu ziņu atsaukšanu ir konstatējums, ka nepatiesā ziņa aizskar prasītāja godu un cieņu, kas ir jāpierāda prasītājam.

Kā atzīts tiesu praksē, pamats piemērot civiltiesisko aizsardzību saskaņā ar Civillikuma 2352.[1] pantu rodas, ja par personu ir izplatītas nepatiesas, godu un cieņu aizskarošas ziņas. Tātad, lai konstatētu šīs normas tiesisko sastāvu, tiesai, pirmkārt, ir jākonstatē, ka noteikta informācija ir izplatīta publiski, nevis aizskartajai personai izteikta privāti. Otrkārt, tiesai jāpārliecinās, ka prasījums attiecas uz publiski izplatītām ziņām, nevis uz viedokli. Treškārt, tiesai jānovērtē, vai izplatītās ziņas ir prasītāja godu un cieņu aizskarošas. Ceturtkārt, ir jānoskaidro, vai ziņu izplatītājs nevar pierādīt, ka šīs ziņas ir patiesas (*Tiesu prakses apkopojums "Goda un cieņas civiltiesiskā aizsardzība" (2000.-2018.), Augstākā tiesa, 4.lpp.*).

Prasītāja pienākums pierādīt goda un cieņas aizskārumu noteikts Augstākās tiesas judikatūrā. Piemēram, Augstākā tiesa 2018.gada 28.februāra spriedumā lietā Nr.SKC-61/2018 norādījusi, ka pierādīšanas pienākums attiecībā uz goda un cieņas aizskāruma pastāvēšanu ir prasītājam (Civilprocesa likuma 93.panta pirmā daļa), jo tikai prasītājs ir spējīgs sniegt paskaidrojumus un pierādīt to, kā aizskārums izpaudies, ietekmējis viņa godu sabiedrības vai atsevišķu personu acīs un pašvērtējumu (cieņu). Tiesa dod savu vērtējumu vai izplatītās ziņas uzskatāmas par aizskarošām. Tas vien, ka ziņas nav patiesas, nerada pamatu Civillikuma 2352.[1] pantā paredzēto tiesisko seku piemērošanai.

Prasītājs savu pierādīšanas pienākumu nav izpildījis, jo nav iesniedzis nevienu apliecinājumu, ka prasītāja gods un cieņa izteikuma adresāta acīs būtu mazinājušies.

Turklāt, no noskaidrotajiem apstākļiem secināms, ka pirmās instances tiesa ir konstatējusi, ka starp MSIA "Rego Trade" administratoru Kasparu Novicānu un prasītāju nav notikusi komunikācija saistībā ar 2019.gada 20.marta Mārtiņa Bunkus mantinieku Ojāra Bunkus, Daces Bunkus, Kaspara Bunkus, Kristapa Bunkus atbildi uz MSIA "Rego Trade" administratora Kaspara Novicāna kreditora pretenzijām, kā rezultātā prasītājs nav noskaidrojis, vai administratora attieksme pret viņu pēc atbildes saņemšanas ir mainījusies. Prasītājs nav

16

informēts, vai saistībā ar izteikumu prasītāja gods un cieņa administratora acīs varētu būt vai ir mazinājusies.

Nepamatoti tādējādi ir apelatora apgalvojumi [6.3], ka pirmās instances tiesa pārkāpusi Civilprocesa likuma 93.panta ceturtās daļas noteikumus.

[10] Civillietu tiesas koēģija uzskata, ka pirmās instances tiesa jau devusi pamatotu vērtējumu apelācijas sūdzības motīviem, pareizi konstatējusi faktiskos un tiesiskos apstākļus, piemērojusi tiem atbilstošas tiesību normas un pamatoti prasību noraidījusi.

Apelācijas instances tiesā netika konstatēti tādi apstākļi un pierādījumi, kas būtu par pamatu pretēju secinājumu, kā pārsūdzētajā spriedumā, izdarīšanai.

[11] Saskaņā ar Civilprocesa likuma 41.panta pirmo daļu pusei, kuras labā taisīts spriedums, tiesa piespriež no otras puses visus tās samaksātos tiesas izdevumus.

Atbildētājs Ojārs Bunkus iesniedzis zv.advokāta rēķinu par advokāta palīdzību par kopējo summu 1089 EUR (lietas 145.lapa).

Saskaņā ar Civilprocesa likuma 44.panta pirmās daļas 1.punkta b) apakšpunktu atlīdzināmie izdevumi advokāta palīdzības samaksai prasībās, kurām ir mantisks raksturs un kurās prasības summa ir no 8501 *euro* līdz 57 000 *euro*, – to faktiskajā apmērā, tomēr ne vairāk par 2850 *euro*.

No prasītāja par labu atbildētājam Ojāram Bunkus piespriežami izdevumi advokāta palīdzības samaksai 1089 EUR.

Ar lietas izskatīšanu saistītie izdevumi pirmajā instancē ir 22,33 EUR. Apelācijas instancē nav radušies ar lietas izskatīšanu saistītie izdevumi. Prasītājs, ceļot prasību, samaksājis ar lietas izskatīšanu saistītos izdevumus 9,41 EUR. No prasītāja valsts ienākumos piedzenami nesamaksātie ar lietas izskatīšanu saistītie izdevumi 12,92 EUR.

Atbilstoši Civilprocesa likuma 434.panta ceturtajai daļai, 204.[1] pantam nosakāms termiņš sprieduma labprātīgai izpildei.

### Rezolutīvā daļa

Pamatojoties uz Civilprocesa likuma 204.[1] pantu, 431. - 434.pantu, Rīgas apgabaltiesas Civillietu tiesas koēģija

### n o s p r i e d a:

Mihaila Uļmana prasību pret Kristapu Bunkus, Ojāru Bunkus, Kasparu Bunkus un Daci Bunkus par goda un cieņu saturošu ziņu atsaukšanu un mantiskās kompensācijas 10 000 EUR (desmit tūkstoši *euro*) piedziņu – pilnīgi noraidīt.

Piedzīt no Mihaila Uļmana, personas kods 120653-11239, par labu Ojāram Bunkus,

*35.*

personas kods 230356-12878, izdevumus advokāta palīdzības samaksai 1089 EUR (viens tūkstotis astoņdesmit deviņi *euro*).

Piedzīt no Mihaila Uļmana, personas kods 120653-11239, ar lietas izskatīšanu saistītos izdevumus 12,92 EUR (divpadsmit *euro*, 92 *centi*) valsts ienākumos.

Ar lietas izskatīšanu saistītie izdevumi iemaksājami bankas kontā: saņēmējs: Tiesu administrācija, NMR 90001672316, saņēmēja iestāde: Valsts kase, BIC kods TRELLV22, konta Nr. LV51TREL2190458019000. Iemaksas mērķis: 21499 ar lietas izskatīšanu saistītie izdevumi civillietā Nr.C30753819.

Noteikt termiņu desmit dienas no sprieduma spēkā stāšanās dienas sprieduma labprātīgai izpildei.

Spriedumu var pārsūdzēt kasācijas kārtībā 30 (trīsdesmit) dienu laikā no sprieduma pasludināšanas dienas Senāta Civillietu departamentā, kasācijas sūdzību iesniedzot Rīgas apgabaltiesā un iemaksājot Augstākās tiesas depozītu kontā Nr.LV83TREL8280010000000 drošības naudu 300 EUR (trīs simti *euro*).

| | | |
|---|---|---|
| Tiesnese | /paraksts/ | I.Ozola |
| Tiesnese | /paraksts/ | M.Šķendere |
| Tiesnesis | /paraksts/ | J.Freimanis |

**NORAKSTS PAREIZS**
Rīgas apgabaltiesas Civillietu tiesas
kolēģijas tiesnese I.Ozola

Noraksta parakstīšanas datums ir pievienotā droša elektroniskā paraksta un tā laika zīmoga datums.

ŠIS DOKUMENTS IR ELEKTRONISKI PARAKSTĪTS AR DROŠU
ELEKTRONISKO PARAKSTU UN SATUR LAIKA ZĪMOGU

36.

# ANNEX 3

**EXCERPT**

/Coat of arms of the Republic of Latvia/

Case No C30753819
Case archive No CA-0380-21/15
ECLI:LV:RAT:2021:0225.C30753819.9.S

# JUDGMENT

## on behalf of the Republic of Latvia

February 25, 2021

The panel of the Civil Matters Division of the Riga Regional Court in the following composition:

Judge Rapporteur I. Ozola, judges M.Skendere /M. Šķendere/ and J. Freimanis

Reviewed in a written process in Riga, Brivibas bulvaris 34, a civil case in connection with the claim of Mihails Ulmans /Mihails Uļmans/ against Kristaps Bunkus, Ojars Bunkus /Ojārs Bunkus/, Kaspars Bunkus, and Dace Bunkus for the withdrawal of knowledge of honour and dignity and the collection of financial compensation in connection with the appeal of Mihails Ulmans /Mihails Uļmans/ against the Vidzeme Suburb Court of Riga City judgment of October 12, 2020.

[..]

### Reasoned Part

[8] Having evaluated the explanations of the participants in the case in connection with the evidence in the case, having considered the arguments of the appeal, being based on the circumstances established by the evidence in the case, the Civil Matters Division consider that the claim should be dismissed.

According to Section 432, Paragraph Five of the Civil Procedure Law, if the court, in examining a case, recognizes that the justification included in the judgment of the lower instance court is correct and fully sufficient, it may indicate in the reasoned part for the judgment that it agrees with the argumentation of the judgment of the lower instance court. In such case, the considerations specified in Section 193,

Paragraph Five of this Law need not be indicated in the reasoned part of the judgment.

The Civil Matters Division recognize that the justification contained in the judgment of the court of first instance is correct and fully sufficient and agree with the argumentation of the court of first instance in the judgment.

Pursuant to Section 426, Paragraph One of the Civil Procedure Law, an appellate court shall examine a case on the merits in connection with an appeal [..] to the extent as is requested in such appeal.

[9] Pursuant to Section 430, Paragraph Three, facts that have been established by a court of first instance are not required to be examined by an appellate court if these have not been contested in the appeal.

In the appeal, the facts established by the court of first instance are not contested, namely, the phrase containing the contested statement, formulated on March 20, 2019 by Martins Bunkus` /Mārtiņš Bunkus/ heirs Ojars Bunkus /Ojārs Bunkus/, Dace Bunkus, Kaspars Bunkus, Kristaps Bunkus, in the response to the creditor's claim No. 2-408/18 of September 10, 2018 and the creditor's claim of September 7, 2018 made by Kaspars Novicans /Kaspars Novicāns/, administrator of MSIA "Rego Trade": "The outcome of Civil Case No. C04268909 further will depend directly on the actions and professionalism of the administrator, especially on the circumstances when the heirs know that all these years, while Martins Bunkus /Mārtiņš Bunkus/ has been the administrator in the insolvency proceedings of MSIA "Rego Trade", M. Ulmans /M. Uļmans/ has tried to force the administrator Martins Bunkus /Mārtiņš Bunkus/ to give up all claims against him, including threats were made to Martins Bunkus /Mārtiņš Bunkus/, including threats to fabricate criminal cases against him, involving high-ranking officials, about whom M. Ulmans /M. Uļmans/ bragged." (page 10 of the case).

[9.1] Due to the above reasons, the Civil Matters Division do not agree with the statements in the appeal [6.1] that the contested statement is knowledge.

Knowledge is a collection of data, facts, figures and information. In turn, an opinion is views, an understanding (of something.), also an attitude (towards something). Opinion as a subjective assessment can be formed either from true facts or from erroneous knowledge, false information, and it is not provable (*Judgment of the Senate of the Supreme Court dated May 8, 2002 in Case No. SKC-261/2002; Judgment of the Supreme Court dated September 24, 2015 in Case No. SKC-204/2015; Judgment of March 6, 2017 in Case No. SKC- 98/2017; Judgment of March 6, 2017 in Case No. SKC-98/2017*). Only knowledge or facts can be subjected to verification and their existence can be proven, whereas an opinion reflects a person's subjective assessment of a person, his/her activity or an event and can be neither true nor false (*Judgment of the Senate of the Supreme Court dated February 9, 2011, in the Case No. SKC-60*).

To determine whether a statement corresponds to the concept of " knowledge " or "opinion", it is necessary to analyse the circumstances of the conflict situation, the content and context of the specific statements, as well as other criteria, including what the Defendant's purpose was when using such statements. Thus, the determining criteria are: 1) the overall context of the statements; 2) the meaning that a neutral person could assign to such statement; 3) explanations of the author of the statement (*Judgment of the Supreme Court dated September 24, 2015 in Case No. SKC-204/2015*).

[9.2] The appeal does not contest that the overall context of the statement is related to the factual circumstances of the case, such as the long-term disagreement between Martins Bunkus /Mārtiņš Bunkus/ and the Plaintiff regarding the insolvency proceedings of MSIA "Rego Trade".

From May 6, 2008, until the day of his death, Martins Bunkus /Mārtiņš Bunkus/ performed the duties of an administrator in the insolvency proceedings of SIA "Rego Trade" (pages 89-92 of the case).

[9.2.1] There is no reason to question the circumstances stated in the Defendants' explanations, which are also confirmed by the information in the Courts' information system, not disputed by the Plaintiff as well, that Martins Bunkus /Mārtiņš Bunkus/ brought several claims on behalf of the debtor SIA "Rego Trade", including against Mihails Ulmans /Mihails Uļmans/, as a former member of the board of the debtor, for the recovery of loss and covered debt (civil case No. C04268909, civil case No. C04268309, No. C04268409); due to the application of Martins Bunkus /Mārtiņš Bunkus/, criminal process No. 11514002509 for bringing MSIA "Rego Trade" to insolvency, criminal process No. 12814010208 for obstructing the debtor's insolvency proceedings were initiated; prior to the declaration of the debtor's insolvency proceedings, based on the application of the secured creditor JSC "PNB Bank", criminal process No. 11517013008 for the expropriation of the debtor's pledged property without the pledgee's permission was initiated.

[9.2.2] In the case, it has been established that in the application of February 8, 2016 to the Prosecutor General, Martins Bunkus /Mārtiņš Bunkus/ stated: "[..] I also have a real fear that violence and physical settling an account may be used against me in M. Ulmans' / M. Uļmans/ assignment, especially such fears intensified for me after the judgment of the Civil Courts Chamber of the Supreme Court of October 26, 2015, by which EUR 721,186.20 was recovered from Mihails Ulmans /Mihails Uļmans/." (page 110 of the case).

On March 8, 2016, Martins Bunkus /Mārtiņš Bunkus/ stated to the Corruption Prevention and Combating Bureau: "[..] I have also received threats and pressure was put on me to issue a power of attorney to terminate the legal proceedings initiated against M. Ulmans / M. Uļmans/ and to terminate the criminal

process No. 11514002509 for bringing MSIA "Rego Trade" to insolvency. I was also warned that if I did not give such power of attorney, then I would have to face negative consequences and problems with law enforcement authorities.

However, despite the threats expressed to me and the pressure put on me, I continued to fulfil my duties as an administrator in accordance with the requirements of the Insolvency Law [..]".

"[..]Immediately after the announcement of such court rulings, M. Ulmans' / M. U|mans/ threats intensified. I was told that M. Ulmans / M. U|mans/ would "sort things out" by involving officials on a larger scale and would provide me with problems. Among his acquaintances, M. Ulmans / M. U|mans/ is boasting of very close relations with senior officials of various law enforcement agencies and spreading information that money has already been transferred to such officials and problems with law enforcement agencies are guaranteed for me, I will be removed from the position of administrator of MSIA "Rego Trade" and he will take serious revenge on me and settle an account with me [..]." (page 94, 95 of the case)

Martins Bunkus /Mārtiņš Bunkus/ stated in his explanations to the Corruption Prevention and Combating Bureau on July 18, 2016: "[..] Also now, at the end of 2015, after 16.09.2015 when the Supreme Court decided to consider my cassation complaint regarding the recovery of EUR 1,333,131.29 from M. Ulmans / M. U|mans/ in an expanded composition, but on 26.10.2015. the Civil Court Chamber of the Supreme Court pronounced a judgment on the recovery of EUR 721,186.20, the threats from M. Ulmans /M. U|mans/ intensified. M. Ulmans / M. U|mans/ spread the information among his close people that he would take serious revenge, he would attract high-ranking officials and problems with law enforcement institutions would be guaranteed for me, because he had already given the money. A person close to M. Ulmans / M. U|mans/ provided me with that information, which I unequivocally perceived as a threat from M. Ulmans / M. U|mans/, which had been expressed intermittently. In this regard, I filed an application dated 08.02.2016 in the LR General Prosecutor's Office [..].

[..] I have intermittently received threats, namely, M. Ulmans / M. U|mans/ spread the information among his close people that he would "sort things out" by involving high-ranking officials and money had already been given to them and problems with law enforcement authorities were guaranteed for me, I would be removed from the position of administrator of MSIA "Rego Trade" and he would take serious revenge on me and settle accounts with me. Also, M. Ulmans / M. U|mans/ spread the information among his close people that if I did not withdraw the legal proceedings against him, then the campaigns and publications defaming me and my family members would be continued.

That information was given to me by one of the persons close to M. Ulmans / M. U|mans/. I perceived

41.

that information as a threat from M. Ulmans / M. U|mans/. Already in 2012, M. Ulmans' / M. U|mans/ threats to cause me problems with law enforcement authorities were confirmed, because they were actually implemented. In this case, too, the threats expressed by M. Ulmans / M. U|mans/ are actually implemented. The aforementioned is confirmed by the fact that after such information was given to me, I received a summons with an invitation to appear at the police in criminal proceedings No. 11514002312, in which nothing was done for more than four years, and which should have been terminated long ago due to the statute of limitations.

[..] M. Ulmans /M. U|mans/ also carried out public smear campaigns against me and my family members, using the services of the portal www.pietiek.com and paying for them. This also confirms the seriousness of M. Ulmans' /M. U|mans/ threats and the unequivocal intention to implement these threats.

Also, such actions, when M. Ulmans /M. U|mans/ attempted to bribe the judge of the Latgale Suburb Court of Riga, K. Vinta-Korma, in the civil case C29352916, just confirmed that M. Ulmans' /M. U|mans/ threats were real and he actually carried out such threats.

I also perceived as a threat the case when, in a conversation with a person I know personally, M. Ulmans' /M. U|mans/ trusted person mentioned, among other things, the case between me and MSIA "Rego Trade", stating that people tend to be shot for such similar cases, as it once happened with M. Ulmans' /M. U|mans/ associate. I also perceived such message from M. Ulmans' /M. U|mans/ trusted person as a very serious threat to me because M. Ulmans /M. U|mans/ does not rule out the possibility of settling an account with me physically. Pressure was exerted in such a way that countless fabricated and baseless complaints were made about me.

[..] I want to make it clear that I continue to feel threatened and anxious that the threat will continue to be carried out. M. Ulmans /M. U|mans/ has actually started to fulfil his threats, both by attracting a high-ranking official - possibly A. Sozinovs, and possibly even by trying to bribe the court. A public smear campaign was carried out against me and my family members. Every day I live with anxiety about the life and health of myself and my family. With the message that people were shot in similar cases, as happened with M. Ulmans' /M. U|mans/ associate, I was made to understand that M. Ulmans / M. U|mans/ does not rule out settling an account physically.

Since M. Ulmans / M. U|mans/ has already started to implement his threats, I consider the threats to be very real and serious. Since I will not succumb to threats and pressure and will continue legal proceedings against M. Ulmans /M. U|mans/ for the benefit of MSIA "Rego Trade", as it was decided by the creditors' meeting of MSIA "Rego Trade" on 30.11.2015, then I feel threatened also now, because

everything that has happened before indicates that M. Ulmans /M. Uļmans/ will not stop and will continue to carry out his threats, to bribe officials, to publicly slander me and my family members, I am also worried about the fact that he will also settle an account with me physically in M. Ulmans' /M. Uļmans/ assignment." (pages 100-106 of the case).

[9.3] Considering the actual circumstances [9.2.1], which took place before the contested statement was included in the response of Martins Bunkus' /Mārtiņš Bunkus/ heirs Ojars Bunkus /Ojārs Bunkus/, Dace Bunkus, Kaspars Bunkus, Kristaps Bunkus to the creditor's claims made by Kaspars Novicans /Kaspars Novicāns/, administrator of MSIA "Rego Trade", the kinship between the Defendants and Martins Bunkus /Mārtiņš Bunkus/ the Civil Matters Division has no reason to doubt that Martins Bunkus /Mārtiņš Bunkus/ could have told the family members about the conflict situation with the Plaintiff, as well as about his suspicions and experiences in this regard, that in connection with Martins Bunkus' /Mārtiņš Bunkus/ suspicions, the Defendants could also have formed a similar idea about the Plaintiff and the conflict situation in general.

The Civil Matters Division consider the findings of the Supreme Court that the subjective suspicions expressed to a third person cannot be qualified as knowledge dissemination, but as a personal opinion, and it cannot be recognized as knowledge dissemination and therefore cannot be demanded to be withdrawn (*Judgment of the Supreme Court Senate of May 31, 2013 in case No. SKC-250/2013*). Thus, if Martins Bunkus /Mārtiņš Bunkus/ had such suspicions, about which he informed the law enforcement authorities [9.2.2], then the Defendants could have formed a similar idea about the Plaintiff and the conflict situation in general on the basis of these suspicions.

[9.4] Thus, the Civil Matters Division conclude that the contested statement is the opinion of the Defendants, which was formed based on what Martins Bunkus /Mārtiņš Bunkus/said about his negative experience with the Plaintiff, his actions during the insolvency proceedings, as well as Martins Bunkus' /Mārtiņš Bunkus/ fear for his life, due to which he applied to law enforcement agencies several times. The Defendants are of the opinion that the Plaintiff acted in the manner described by Martins Bunkus /Mārtiņš Bunkus/, i.e. the Plaintiff was actively trying to force or encourage Martins Bunkus /Mārtiņš Bunkus/ to give up the claims brought on behalf of MSIA "Rego Trade" by various methods.

[9.4.1] Also, the Defendants got the impression that the threats expressed to Martins Bunkus /Mārtiņš Bunkus/, including harming his reputation, as well as "fabricating" criminal proceedings against him, i.e. to act in a way that criminal cases would be initiated against Martins Bunkus /Mārtiņš Bunkus/, were implemented because circumstances, which were not contested by the Plaintiff as well, had arisen that after

the judgment of February 23, 2012, by which EUR 377,951.96 was recovered from the Plaintiff, on March 1, 2012, the Plaintiff applied to the Criminal Police Department of the State Police's Riga Regional Office with an application, as a result of which criminal proceedings No. 11514002312 were initiated against Martins Bunkus /Mārtiņš Bunkus/ on March 12, 2012 (page 94 of the case).

[9.5] The Civil Matters Division consider that the appeal [6.2] contains the Plaintiff's outright claims about the allegedly true and allegedly known reason for Martins Bunkus' /Mārtiņš Bunkus/ fear - to be caught hiding information in order to achieve a financially favourable court judgment for the recovery of EUR 721,186.20, because the Plaintiff has not submitted evidence of the validity of such assumptions. In addition, such subjective assumptions of the Plaintiff, in the opinion of the Civil Matters Division, cannot overturn the evidence that the Defendants had a reason to rely on the opinion of Martins Bunkus /Mārtiņš Bunkus/ and form their own opinion based on the information received from Martins Bunkus /Mārtiņš Bunkus/.

[9.6] The statement in the appeal [6.3] that the obligation to withdraw false knowledge does not depend on the fact whether evidence that the assessment of the Plaintiff in the eyes of the recipient of the knowledge has deteriorated due to false knowledge exists is unfounded.

A prerequisite for the application of Section 2352.[1] of the Civil Law, on which the claim is based, in relation to the withdrawal of false information violating his or her honour and dignity is a finding that the false knowledge violates the Plaintiff's honour and dignity, which must be proved by the Plaintiff.

As recognized in court practice, the basis for applying civil protection in accordance with Section 2352.[1] of the Civil Law arises when false knowledge about a person violating his or her honour and dignity is disseminated. So, in order to establish the legal composition of this rule, the court, first of all, must establish that certain information has been disseminated publicly, and not expressed privately to the violated person. Secondly, the court must satisfy itself that the claim relates to publicly disseminated knowledge and not to opinion. Thirdly, the court must assess whether the disseminated knowledge violates the Plaintiff's honour and dignity. Fourthly, it is necessary to find out whether a knowledge disseminator can prove that the knowledge is true (*Compilation of Case-Law "Civil Protection of Reputation and Dignity" (2000-2018), Supreme Court, page 4*).

The Plaintiff's obligation to prove violation of honour and dignity is defined in the case-law of the Supreme Court. For example, the Supreme Court in its judgment of February 28, 2018 in case No. SKC-61/2018 stated that the burden of proof regarding the existence of violating honour and dignity rests with the Plaintiff (Section 93, first part of the Civil Procedure Law), because only the Plaintiff is able to provide

44.

explanations and prove how violation manifested itself, affected his or her dignity in the eyes of society or individual persons and self-esteem (respect). The court shall give its assessment as to whether the disseminated knowledge is considered offensive. The mere fact that the knowledge is not true does not create a basis for applying the legal consequences provided for in Section 2352.[1] of the Civil Law.

The Plaintiff has not fulfilled his burden of proof, as he has not submitted any confirmation that the Plaintiff's honour and dignity in the eyes of the addressee of the statement have diminished.

In addition, from the established circumstances, it can be concluded that the court of first instance has established that there was no communication between Kaspars Novicans /Kaspars Novicāns/, administrator of MSIA "Rego Trade" and the Plaintiff in connection with the response dated March 20, 2019 given by Martins Bunkus' /Mārtiņš Bunkus/ heirs Ojars Bunkus /Ojārs Bunkus/, Dace Bunkus, Kaspars Bunkus, Kristaps Bunkus to the creditor's claims of Kaspars Novicans /Kaspars Novicāns/, administrator of MSIA "Rego Trade", as a result of which the Plaintiff has not ascertained whether the administrator's attitude towards him has changed after receiving the response. The Plaintiff has not been informed whether the Plaintiff's honour and dignity in the eyes of the administrator could or has diminished in connection with the statement.

Therefore, the appellant's claims [6.3] that the court of first instance violated the provisions of Section 93, Part Four of the Civil Procedure Law are unfounded.

[10] The Civil Matters Division consider that the court of first instance has already given a reasonable assessment of the reasons of the appeal, correctly ascertained the factual and legal circumstances, applied the corresponding legal norms to them and justifiably dismissed the claim.

The appellate court has not found circumstances and evidence, which would be the basis for making the opposite conclusions as in the appealed judgment.

[11] According to Section 41, Paragraph One of the Civil Procedure Law, the court shall adjudge the reimbursement of all court expenses paid by the party for the benefit of which the judgment is given from the opposing party to the former party.

The Defendant Ojars Bunkus /Ojārs Bunkus/ has submitted an attorney's bill for the assistance of an attorney for the total amount of EUR 1089 (page 145 of the case).

According to Section 44, Paragraph One, Clause 1b) of the Civil Procedure Law, reimbursable expenses for paying for the assistance of an attorney in claims, which are financial in nature and the amount claimed of which is EUR 8,501 - 57,000 - in the actual amount thereof, but not exceeding EUR 2,850.

From the Plaintiff, in favour of the Defendant Ojars Bunkus /Ojārs Bunkus/, expenses for paying the

45.

assistance of an attorney - 1089 EUR shall be adjudged.

The expenses related to the examination of the case in the first instance are EUR 22.33. No expenses related to the examination of the case have been incurred in the appellate instance. The Plaintiff, when filing the claim, paid the expenses related to the examination of the case in the amount of EUR 9.41. The unpaid expenses related to the examination of the case amounting to 12.92 EUR shall be collected from the Plaintiff in favour of the state revenue.

Deadline for voluntary execution of the judgment shall be set in accordance with Section 434, Paragraph Four, Section 204[1] of the Civil Procedure Law.

## Operative Part

On the basis of Section 204[1], Section 431 - 434 of the Civil Procedure Law, the Civil Matters Division of the Riga Regional Court

### delivered a judgment:

Mihails Ulmans' /Mihails Uļmans/ claim against Kristaps Bunkus, Ojars Bunkus /Ojārs Bunkus/, Kaspars Bunkus and Dace Bunkus for the withdrawal of knowledge violating honour and dignity and the collection of financial compensation of 10,000 EUR (ten thousand euros) - to be completely dismissed.

Collect from Mihails Ulmans /Mihails Uļmans/, personal code 120653-11239, in favour Ojars Bunkus /Ojārs Bunkus/, personal code 230356-12878, expenses for paying the assistance of attorney in the amount of EUR 1089 EUR (one thousand eighty-nine euros).

Collect from Mihails Ulmans /Mihails Uļmans/, personal code 120653-11239, the expenses related to the examination of the case in the amount of EUR 12.92 (twelve euros, 92 cents) in favour of the state revenue.

[..]

**EXCREPT CORRECT**
Kristaps Bunkus
Riga, January 13,2023

46.

# ANNEX 4

47.



Latvijas Republikas Uzņēmumu reģistrs

# Akciju sabiedrība "TRASTA KOMERCBANKA"
Public Limited Company

## Overview

| | |
|---|---|
| Registration number | 40003029667 |
| SEPA Creditor Identifier | LV17ZZZ40003029667 |
| Legal address | Krišjāņa Valdemāra iela 33 – 1, Rīga, LV-1010 |
| Registered on | 27.09.1991 |
| Type | Public Limited Company |
| Register | Commercial Register |
| Equity capital | Equity (history): 6337100.00 LVL<br>Registered on: 31.03.2008<br>Registered equity: 20641316.00 EUR<br>Registered on: 08.04.2014<br>Paid-up equity: 20641316.00 EUR<br>Registered on: 08.04.2014 |
| Annual reports submitted | 1995, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 |

## Officers

| Person data | Position | Appointed | Registered on | Rights of representation |
|---|---|---|---|---|
| Rasa Armands<br>p.c. 140383-11355 | | 21.06.2017 | 21.06.2017 | Right to represent individually |

## Securing measures

| Securing measure | |
|---|---|
| Securing measure | Prohibition |

48.

| | |
|---|---|
| Imposed on | 08.03.2018 |
| Imposed by | Rīgas pilsētas Vidzemes priekšpilsētas tiesa |
| Case No. | C30694217 |
| Note | Ar Rīgas pilsētas Vidzemes priekšpilsētas tiesas 27.02.2018. lēmumu lietā Nr. C30694217 piemērota aizlieguma atzīme Latvijas Republikas Uzņēmumu reģistra Komercķīlu reģistrā, aizliedzot likvidējamai Akciju sabiedrība "TRASTA KOMERCBANKA", reģistrācijas Nr. 40003029667, jebkādā veidā izlietot tiesības uz komercķīlu Nr.100169195 |

## Liquidation process

| Type of liquidation result | Liquidation's initiation | Substantiation |
|---|---|---|
| Liquidation proceeding | 14.03.2016 | Rīgas pilsētas Vidzemes priekšpilsētas tiesas 14.03.2016. spriedums lietā Nr. C30489916 |

## Insolvency proceedings

| Date of process start | Insolvency proceeding details |
|---|---|
| 10.03.2017 | https://maksatnespeja.ur.gov.lv/insolvency/proceeding/en/788072 |

Information is true and reliable, and corresponds to entries of the registers kept by the Enterprise Register of the Republic of Latvia and other registered information

www.ur.gov.lv          Phone number: 67 031 703          Email: pasts@ur.gov.lv

https://info.ur.gov.lv/#/legal-entity/40003029667

49.

# TRASTA KOMERCBANKA, Akciju sabiedrība


Historical data 🔒 | AML report 🔒 | Follow ❯

Extensive and legally valid database containing all companies, associations and enterprises, as well as foreign representations that are registered in Latvia.



Add logo     Krisjana Valdemara iela 33- 1, Riga, Latvia

Add e-mail
Add home page     📞 Add phone nr.

Other monetary intermediation

✏️        Additional data!

## Basic data     —

| | |
|---|---|
| Name | Akciju sabiedrība "TRASTA KOMERCBANKA" |
| Legal form | Joint stock company (AS) |
| Registration number, date | **40003029667, 27.09.1991** |
| Register, included in The Register | Commercial register, 28.04.2003 |
| SEPA identifier | LV17ZZZ40003029667 |
| Data from the VAT Register | Data from the VAT Register |

| VAT identification number | Status | Registered | Excluded |
|---|---|---|---|
| LV40003029667 | ✔ | 12.12.1996 | |

| | |
|---|---|
| Legal address | <u>Rīga, Krišjāņa Valdemāra iela 33 - 1, LV-1010</u> |
| Postal address | Krišjāņa Valdemāra iela 33 - 1, Rīga, LV-1010 |
| Certificate of registration | Nr. C11560, 28.04.2003 |
| Fixed capital | Paid capital - 20 641 316.00 EUR (Registered in State Enterprise register 08.04.2014) Registered capital - 20 641 316.00 EUR (Registered in State Enterprise register 08.04.2014) |
| Activity code (NACE) | Other monetary intermediation (<u>64.19</u>, version 2.0) (Source: SRS, ZO.LV) Other financial service activities, except insurance and pension funding n.e.c. (<u>64.99</u>, version 2.0) (Source: CSB) <u>History of changes in activities</u> |
| Data updated in the Register of Enterprises | 19.06.2020 |

## Encumbrances     —

| | |
|---|---|
| Liquidation process | 14.03.2016. Rīgas pilsētas Vidzemes priekšpilsētas tiesas 14.03.2016. spriedums lietā Nr. C30489916 |
| Actual entry in the insolvency register | <u>Yes</u> ❶ |
| Actual delayed payments | Not registered |
| Actual pledge acts | Not registered |
| Actual collaterals | <u>Yes</u> ❶ |
| SRS administered tax debts | <u>Not registered</u> to 10.01.2023 ❶ <u>Find out current information about tax debts</u> |

## Financial indicators (last submitted year)     +

## Annual reports (37)     +

*50.*

## Tax payments to state budget
*(thous. EUR)*                                                          ? —

| Year | Total payments to state budget | Personal income tax | State mandatory social insurance contributions | See details |
|------|-------------------------------|---------------------|-----------------------------------------------|-------------|
| 2021 | ↓ -11.20 | 0.00 | 0.00 | Payment history and comparison with industry |
| 2020 | 13.45 | 0.00 | 0.00 | |

Source: SRS

## ACTUAL DATA                                                          —

Due to amendments to the Commercial Law in connection with the official mandate, please become acquainted with <u>the latest version of the statutes and the minutes of shareholders' meeting</u>. This will help you to be sure that in these documents the expiry date of the mandate is not specified.

### Actual data. Officials (1)                                          —

| Time | Post, Rights to represent |
|------|---------------------------|
| **Rasa Armands** (140383-11355) | ✂ 👤 🖼 🔒 |
| From 21.06.2017 | Administrator/ Right of sole representation |

Document country on the date of registration: **Latvia**

### Actual data. List of procurations (0)                               +

### Actual data. List of shareholders (14)                              +

### Actual data. List of beneficial owners (0)   <u>**Send report to the Register of Enterprises**</u> +

*51.*

# HISTORICAL DATA

## Historical data. Board (56)

| Time | Post, Rights to represent |
|------|---------------------------|

**1. Diure Edgars** (220673-11215)

08.04.2014 - 14.03.2016    Member of the Board/ Together with the rest of

Document country on the date of registration: **Latvia**

**2. Fogelis Māris** (220768-11801)

27.03.2015 - 14.03.2016    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**3. Grieze Gundars** (101261-10715)

27.03.2015 - 14.03.2016    Head of the board/ Right of sole representation

Document country on the date of registration: **Latvia**

**4. Ignatjeva Jeļena** (080768-11800)

27.03.2015 - 14.03.2016    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**5. Ziemelis Viktors** (220670-12020)

27.03.2015 - 19.01.2016    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**6. Krasovska Svetlana** (050268-10611)

27.03.2015 - 23.12.2015    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**7. Fogelis Māris** (220768-11801)

29.03.2012 - 27.03.2015    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**8. Grieze Gundars** (101261-10715)

29.03.2012 - 27.03.2015    Head of the board/ Right of sole representation

Document country on the date of registration: **Latvia**

**9. Konnova Tatjana** (240754-11821)
Dead

29.03.2012 - 27.03.2015    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**10. Krasovska Svetlana** (050268-10611)

29.03.2012 - 27.03.2015    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**11. Ziemelis Viktors** (220670-12020)

29.03.2012 - 27.03.2015    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**12. Fogelis Māris** (220768-11801)

02.04.2009 - 29.03.2012    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**13. Grieze Gundars** (101261-10715)

02.04.2009 - 29.03.2012    Head of the board/ Right of sole representation

Document country on the date of registration: **Latvia**

**14. Konnova Tatjana** (240754-11821)
Dead

02.04.2009 - 29.03.2012    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**15. Krasovska Svetlana** (050268-10611)

02.04.2009 - 29.03.2012    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**16. Ziemelis Viktors** (220670-12020)

52.

## Historical data. Board (56)

| Time | Post, Rights to represent |
|------|---------------------------|
| 02.04.2009 - 29.03.2012 | Member of the Board/ Together with all the rest of |

Document country on the date of registration: **Latvia**

**17. Fogelis Māris** (220768-11801)

10.04.2006 - 02.04.2009    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**18. Grieze Gundars** (101261-10715)

10.04.2006 - 02.04.2009    Head of the board/ Right of sole representation

Document country on the date of registration: **Latvia**

**19. Konnova Tatjana** (240754-11821)
Dead

10.04.2006 - 02.04.2009    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**20. Krasovska Svetlana** (050268-10611)

10.04.2006 - 02.04.2009    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**21. Ziemelis Viktors** (220670-12020)

19.08.2008 - 02.04.2009    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**22. Ziemelis Viktors** (220670-12020)

10.04.2006 - 19.08.2008    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**23. Buimisters Igors** (071164-10522)
Dead

28.04.2003 - 10.04.2006    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**24. Fogelis Māris** (220768-11801)

28.04.2003 - 10.04.2006    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**25. Grieze Gundars** (101261-10715)

28.04.2003 - 10.04.2006    Head of the board/ Right of sole representation

Document country on the date of registration: **Latvia**

**26. Krasovska Svetlana** (050268-10611)

28.04.2003 - 10.04.2006    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**27. Ziemelis Viktors** (220670-12020)

28.04.2003 - 10.04.2006    Member of the Board/ Together with all the rest of

Document country on the date of registration: **Latvia**

**28. Tarasenoks Sergejs** (240564-10532)
Dead

28.04.2003 - 17.06.2004    Member of the Board/ Right of sole representation

Document country on the date of registration: **Latvia**

**29. Barkāns Mārtiņš**

   - 28.04.2003

Document country on the date of registration: **Latvia**

**30. Buimisters Igors** (071164-10522)
Dead

06.04.2001 - 28.04.2003    Deputy Chairperson of the Board/ with representative rights

Document country on the date of registration: **Latvia**

**31. Fogelis Māris** (220768-11801)

19.06.2002 - 28.04.2003    Deputy Chairperson of the Board/ with representative rights

## Historical data. Board (56) —

| Time | Post, Rights to represent |
|------|---------------------------|

Document country on the date of registration: Latvia
Pirmais vietnieks, piešķirtas paraksta tiesības no 2002.gada 8.jūlija līdz 2002.gada 5.augustam

### 32. Fogelis Māris (220768-11801)

06.04.2001 - 28.04.2003    Deputy Chairperson of the Board

Document country on the date of registration: Latvia
Valdes priekšsēdētāja pirmais vietnieks

### 33. Grieze Gundars (101261-10715)

15.05.2000 - 28.04.2003    Head of the board/ with representative rights

Document country on the date of registration: Latvia
Prezidents

### 34. Krasovska Svetlana (050268-10611)

30.03.2001 - 28.04.2003

Document country on the date of registration: Latvia

### 35. Skorohodova Inna

   - 28.04.2003

Document country on the date of registration: Latvia

### 36. Tarasenoks Sergejs (240564-10532)
Dead

06.04.2001 - 28.04.2003    Deputy Chairperson of the Board/ with representative rights

Document country on the date of registration: Latvia

### 37. Buimisters Igors (071164-10522)
Dead

30.03.2001 - 06.04.2001

Document country on the date of registration: Latvia

### 38. Fogelis Māris (220768-11801)

12.07.1999 - 06.04.2001

Document country on the date of registration: Latvia
Amats: Valdes priekšsēdētāja pirmais vietnieks (viceprezidents), paraksta tiesības no 21.06.2000. līdz 29.07.2000. Pilnvaru termiņš pagarināts līdz 25.01.2002. Atbrīvots 30.03.2001., kad ar lēmumu ievēlēts par valdes locekli.

### 39. Tarasenoks Sergejs (240564-10532)
Dead

30.03.2001 - 06.04.2001

Document country on the date of registration: Latvia

### 40. Buimisters Igors (071164-10522)
Dead

03.05.2000 - 30.03.2001    with representative rights

Document country on the date of registration: Latvia
Ar 2000.01.08.iecelts valdes priekšsēdētāja vietnieka amatā

### 41. Grieze Guntars (101261-10715)

12.07.1999 - 30.03.2001    with representative rights

Document country on the date of registration: Latvia
Amats: Valdes priekšsēdētāja vietas izpildītājs līdz 1999.gada 29.jūlijam.

### 42. Krasovska Svetlana (050268-10611)

   - 30.03.2001    with representative rights

Document country on the date of registration: Latvia

### 43. Krūmiņš Uģis (070573-10942)

12.07.1999 - 30.03.2001

Document country on the date of registration: Latvia

### 44. Reims Aldis (210667-13058)

   - 30.03.2001    Deputy Chairperson of the Board

Document country on the date of registration: Latvia

54.

| Time | Post, Rights to represent |
|---|---|

**45. Tarasenoks Sergejs** (240564-10532)
Dead

03.05.2000 - 30.03.2001    with representative rights

Document country on the date of registration: **Latvia**
Ar 2000.01.08.iecelts valdes priekšsēdētāja vietnieka amatā

**46. Grigs Boriss** (180449-10133)

   - 03.05.2000

Document country on the date of registration: **Latvia**

**47. Āboliņš Haralds** (131270-10103)

   - 12.07.1999    Deputy Chairperson of the Board/ with representative rights

Document country on the date of registration: **Latvia**

**48. Grieze Gundars** (101261-10715)

15.05.1998 - 12.07.1999

Document country on the date of registration: **Latvia**

**49. Kalniņa Signe** (281168-10617)

   - 12.07.1999

Document country on the date of registration: **Latvia**

**50. Lielcepure Jānis** (250672-10012)

15.05.1998 - 12.07.1999

Document country on the date of registration: **Latvia**

**51. Limbēna Ineta** (020473-12300)

15.05.1998 - 12.07.1999

Document country on the date of registration: **Latvia**

**52. Reirs Jānis** (230961-11807)

   - 12.07.1999

Document country on the date of registration: **Latvia**

**53. Rungainis Ģirts** (310167-12021)

   - 12.07.1999    Head of the board/ with representative rights

Document country on the date of registration: **Latvia**

**54. Putnis Ilmārs**

   - 15.05.1998

Document country on the date of registration: **Latvia**

**55. Upmiņš Andris**

   - 15.05.1998

Document country on the date of registration: **Latvia**

**56. Ušakova Nellija**

   - 15.05.1998

Document country on the date of registration: **Latvia**

## Historical data. Council (47) —

| Time | Post, Rights to represent |
|---|---|

**1. Buimisters Igors** (071164-10522)
Dead

08.04.2014 - 14.03.2016    Chairperson of the Council

Document country on the date of registration: **Latvia**

**2. Čepānis Alfreds** (030843-13059)

08.04.2014 - 14.03.2016    Deputy chairperson of the Council

Document country on the date of registration: **Latvia**

**3. Yershov Artemiy** (800033-16602)*
Date of birth: 30.03.1972

08.04.2014 - 14.03.2016    Member of the Council

Document country on the date of registration: **Ukraine**
Passport: NR.EX530976; Issued: 10.09.2013; the issuing authority: 8089; issuing country: Ukraine

**4. Buimisters Igors** (071164-10522)
Dead

16.10.2013 - 08.04.2014    Chairperson of the Council

Document country on the date of registration: **Latvia**

**5. Čepānis Alfreds** (030843-13059)

16.10.2013 - 08.04.2014    Deputy chairperson of the Council

Document country on the date of registration: **Latvia**

**6. Snisarevskyi Igor** (800019-41906)*
Date of birth: 14.02.1971

16.10.2013 - 08.04.2014    Member of the Council

Document country on the date of registration: **Ukraine**
Passport: NR.EC604813; Issued: 22.06.2006; the issuing authority: Ukrainas Ārlietu ministrija; issuing country: Ukraine

**7. Buimisters Igors** (071164-10522)
Dead

26.10.2010 - 16.10.2013    Chairperson of the Council

Document country on the date of registration: **Latvia**

**8. Čepānis Alfreds** (030843-13059)

26.10.2010 - 16.10.2013    Deputy chairperson of the Council

Document country on the date of registration: **Latvia**

**9. Snisarevskyi Igor** (800019-41906)*
Date of birth: 14.02.1971

26.10.2010 - 16.10.2013    Member of the Council

Document country on the date of registration: **Ukraine**
Passport: NR.EC604813; Issued: 22.06.2006; the issuing authority: Ukrainas Ārlietu ministrija; issuing country: Ukraine

**10. Buimisters Igors** (071164-10522)
Dead

02.04.2009 - 26.10.2010    Chairperson of the Council

Document country on the date of registration: **Latvia**

**11. Čepānis Alfreds** (030843-13059)

02.04.2009 - 26.10.2010    Deputy chairperson of the Council

Document country on the date of registration: **Latvia**

**12. Treherne Charles Edward** (800005-16908)*

02.04.2009 - 26.10.2010    Member of the Council

Document country on the date of registration: **United Kingdom**
the issuing authority:

**13. Buimisters Igors** (071164-10522)
Dead

30.05.2006 - 02.04.2009    Chairperson of the Council

Document country on the date of registration: **Latvia**

**14. Čepānis Alfreds** (030843-13059)

| Time | Post, Rights to represent |
|---|---|
| 30.05.2006 - 02.04.2009 | Deputy chairperson of the Council |

Document country on the date of registration: **Latvia**

**15. Treherne Charles Edward** (800005-16908)*

| | |
|---|---|
| 30.05.2006 - 02.04.2009 | Member of the Council |

Document country on the date of registration: **United Kingdom**
the issuing authority:

**16. Buimisters Igors** (071164-10522)
Dead

| | |
|---|---|
| 30.05.2006 - 05.08.2008 | Chairperson of the Council |

Document country on the date of registration: **Latvia**

**17. Buimisters Igors** (071164-10522)
Dead

| | |
|---|---|
| 10.04.2006 - 30.05.2006 | Chairperson of the Council |

Document country on the date of registration: **Latvia**

**18. Čepānis Alfreds** (030843-13059)

| | |
|---|---|
| 10.04.2006 - 30.05.2006 | Deputy chairperson of the Council |

Document country on the date of registration: **Latvia**

**19. Grigs Boriss** (180449-10133)

| | |
|---|---|
| 10.04.2006 - 30.05.2006 | Member of the Council |

Document country on the date of registration: **Latvia**

**20. Romce Jurijs** (150862-10924)

| | |
|---|---|
| 10.04.2006 - 30.05.2006 | Deputy chairperson of the Council |

Document country on the date of registration: **Latvia**

**21. Treherne Charles Edward** (800005-16908)*

| | |
|---|---|
| 10.04.2006 - 30.05.2006 | Deputy chairperson of the Council |

Document country on the date of registration: **United Kingdom**
the issuing authority:

**22. Čepānis Alfreds** (030843-13059)

| | |
|---|---|
| 28.04.2003 - 10.04.2006 | Member of the Council |

Document country on the date of registration: **Latvia**

**23. Grigs Boriss** (180449-10133)

| | |
|---|---|
| 28.04.2003 - 10.04.2006 | Member of the Council |

Document country on the date of registration: **Latvia**

**24. Romce Jurijs** (150862-10924)

| | |
|---|---|
| 28.04.2003 - 10.04.2006 | Member of the Council |

Document country on the date of registration: **Latvia**

**25. Treherne Charles Edward** (800005-16908)*

| | |
|---|---|
| 28.04.2003 - 10.04.2006 | Member of the Council |

Document country on the date of registration: **United Kingdom**
the issuing authority:

**26. Zimmer Romain Jeannot** (800005-17003)*

| | |
|---|---|
| 28.04.2003 - 10.04.2006 | Member of the Council |

Document country on the date of registration: **Luxembourg**
the issuing authority:

**27. Bērziņš Gaidis** (201070-11219)

| | |
|---|---|
| 06.04.2001 - 28.04.2003 | |

Document country on the date of registration: **Latvia**

**28. Bērziņš Indulis**

| | |
|---|---|
| - 28.04.2003 | |

Document country on the date of registration: **Latvia**

57.

## Historical data. Council (47) —

| Time | Post, Rights to represent |
|------|---------------------------|

**29. Čepānis Alfrēds** (030843-13059)

| 12.07.1999 - 28.04.2003 | Chairperson of the Council |

Document country on the date of registration: **Latvia**

**30. Dombrovskis Gunārs**

| - 28.04.2003 | |

Document country on the date of registration: **Latvia**

**31. Grigs Boriss** (180449-10133)

| 03.05.2000 - 28.04.2003 | |

Document country on the date of registration: **Latvia**

**32. Kalniņš Aivars**

| - 28.04.2003 | |

Document country on the date of registration: **Latvia**

**33. Treherne Charles Edward**

| 06.04.2001 - 28.04.2003 | |

Document country on the date of registration: **United Kingdom**

**34. Vītols Māris**

| - 28.04.2003 | |

Document country on the date of registration: **Latvia**

**35. Zimmer Romain Jeannot**

| 06.04.2001 - 28.04.2003 | |

Document country on the date of registration: **Luxembourg**

**36. Gubazss Astamurs**

| 12.07.1999 - 06.04.2001 | |

Document country on the date of registration: **Russian Federation**

**37. Sekerka Bohuslav**

| 14.02.2000 - 06.04.2001 | |

Document country on the date of registration: **Czech Republic**

**38. Vītoliņš Vilnis** (291055-11819)

| - 06.04.2001 | |

Document country on the date of registration: **Latvia**

**39. Cimzietis Jānis** (190940-10402)

| 15.05.1998 - 03.05.2000 | |

Document country on the date of registration: **Latvia**

**40. Kiezler Radim**

| 14.02.2000 - 03.05.2000 | |

Document country on the date of registration: **Czech Republic**

**41. Čapkevičs Armants** (100765-11501)

| - 12.07.1999 | |

Document country on the date of registration: **Latvia**

**42. Medens Jānis** (100352-10104)

| - 12.07.1999 | Chairperson |

Document country on the date of registration: **Latvia**

**43. Osis Andrejs** (290957-11242)

| - 12.07.1999 | |

Document country on the date of registration: **Latvia**

**44. Ušakova Nella** (171261-11816)

| 15.05.1998 - 12.07.1999 | |

Document country on the date of registration: **Latvia**

**45. Grieze Gundars**

58.

## Historical data. Council (47)

| Time | Post, Rights to represent |
|---|---|
| - 15.05.1998 | |

Document country on the date of registration: **Latvia**

### 46. Kivmans Dmitrijs

| - 15.05.1998 | |
|---|---|

Document country on the date of registration: **Germany**

### 47. Ušakovs A.

| - 15.05.1998 | |
|---|---|

Document country on the date of registration: **Latvia**

| Time | Post, Rights to represent |
|---|---|

**1. Krūms Ilmārs** (280571-11815)

15.03.2017 - 21.06.2017    Administrator/ Right of sole representation

Document country on the date of registration: Latvia

**2. Krūms Ilmārs** (280571-11815)

14.03.2016 - 15.03.2017    Liquidator/ Right of sole representation

Document country on the date of registration: Latvia

Sakarā ar maksātnespējas procesa pasludināšanu apturēta pārvaldes institūcijas darbība.

**3. ERNST & YOUNG BALTIC, Sabiedrība ar ierobežotu atbildību** (40003593454)

Actual address: Rīga, Muitas iela 1A

10.04.2006 - 18.04.2006    Auditor

Document country on the date of registration: Latvia

18.04.2006 ziņas par revidentu izslēgtas, pamatojoties uz Komerclikuma pārejas noteikumu 8.punktu

**4. ERNST & YOUNG BALTIC, Sabiedrība ar ierobežotu atbildību** (40003593454)

Actual address: Rīga, Muitas iela 1A

08.09.2005 - 10.04.2006    Auditor

Document country on the date of registration: Latvia

**5. DELOITTE & TOUCHE Sabiedrība ar ierobežotu atbildību** (40003247787)

Actual name: Sabiedrība ar ierobežotu atbildību "Deloitte Latvia"

Actual address: Rīga, Grēdu iela 4A

28.04.2003 - 08.09.2005    Auditor

Document country on the date of registration: Latvia

**6. Brige Andra**

  - 28.04.2003

Document country on the date of registration: Latvia

**7. Čistjakovs Nikolajs**

  - 28.04.2003

Document country on the date of registration: Latvia

**8. Golubicka Marija**

  - 28.04.2003    Deputy Chief accountant

Document country on the date of registration: Latvia

**9. Grebņeva Jeļena**

  - 28.04.2003

Document country on the date of registration: Latvia

**10. Kacmans Ļevs**

  - 28.04.2003    Managing Director

Document country on the date of registration: Israel

**11. Krasovska Svetlana** (050268-10611)

30.10.1996 - 28.04.2003    Chief accountant/ with representative rights

Document country on the date of registration: Latvia

Otrā paraksta tiesības.

**12. Laks Leo**

  - 28.04.2003

Document country on the date of registration: Germany

**13. Mihailova Tatjana**

  - 28.04.2003    Chief accountant

Document country on the date of registration: Latvia

**14. Paks Gorgins**

  - 28.04.2003

Document country on the date of registration: Latvia

**15. Paže Aleksandrs**

  - 28.04.2003

60.

## Historical data. Officials (21)

| Time | Post, Rights to represent |
|------|---------------------------|

Document country on the date of registration: **Latvia**

### 16. Roitmans Leonīds

| - 28.04.2003 | Managing Director |

Document country on the date of registration: **Israel**

### 17. Rozenvalds Boriss

| - 28.04.2003 | |

Document country on the date of registration: **Israel**

### 18. Sokolovs Aleksandrs

| - 28.04.2003 | Deputy Chairperson of the Board |

Document country on the date of registration: **Latvia**

### 19. Soms Roberts (061234-12601)
Dead

| - 28.04.2003 | Head of the board |

Document country on the date of registration: **Latvia**

### 20. Stankeviča Monika (101047-10621)

| 30.10.1996 - 28.04.2003 | Deputy Chief accountant/ with representative rights |

Document country on the date of registration: **Latvia**

Amats: Galvenā grāmatveža vietnieks (otrā paraksta tiesības)

### 21. Stenclava Brigita

| 06.08.1997 - 25.06.1998 | Authorized person |

Document country on the date of registration: **Latvia**

## Comparative indices

## Legal address on the map

## Publications (0)

© Lursoft IT 1997-2023 Lursoft is the re-user of information from the Enterprise Register of Latvia. The user is obliged to observe the Copyright law. Personal Data Processing Law requirements and Terms of Use of the Lursoft system. The user is forbidden to use any automatic systems or robots in order to access the system without a written approval from Lursoft. The information included in the Services, which Lursoft receives as a re-user from the data source, is provided to the user, ensuring the correctness and accuracy of the information content (consistency of the nature of the information). Lursoft does not bear any responsibility for actions or decisions that are based on the service provided.

**LURSOFT**

Matīsa street 8 | Rīga, LV-1001 | www.lursoft.lv | Phone 67844300 | E-mail info@lursoft.lv

61.

# ANNEX 5

13.01.2023. 17:30:2

# The Land Register data on property

> **RĪGAS PILSĒTAS TIESA**
> **Rīgas pilsētas zemesgrāmatas nodalījums Nr. 547**
> **Kadastra numurs: 0100 094 0173**
> **Adrese: Meža prospekts 38A, Rīga**

| Record No. | Section II, Subsection 1<br>Owner, year of birth, place of birth, identification No/Registration No of taxpayer, legal basis for title | Section | Amount |
|---|---|---|---|
| 1.1. | Uz Latvijas Valsts Vēstures arhīva 1993.gada 30.septembra izziņas Nr.Par-1233/3 pamata ir nostiprinātas īpašuma tiesības Latvijas Valstij FINANSU MINISTRIJAS personā. namīpašuma vērtība Ls 6324,24 (seši tūkstoši trīs simti divdesmit četri lati, 24 santīmi).<br>*Spēkā esošs*<br><small>Žurn. Nr. 695, lēmums 12.07.1994, tiesnese Gunta Freiberga</small> | 1 | 6,324.24LVL |
| 2.1. | Uz Lattvijas Republikas Ministru kabineta 1994.gada 19.jūlija rīkojuma Nr.332-r un 1995.gada 20.marta 20.marta nekustamā īpašuma Rīgā, Kalēju ielā 7 un Meža prospektā 38 a pieņemšanas-nodošanas akta pamata ir nostiprinātas īpašuma tiesības ILZEI GRABOVSKAI, dzimusi 1929.gadā Rīgā, personas kods 200429-10124 , ARNOLDAM KALĒJAM, dzimis 1929.gadā Rīgā, personas kods 101229-10504, un LĪVIJAI GULBEI, dzimusi 1907.gadā Rīgā, personas kods 12007-12518, 1/3 (vienas trešās) domājamās daļas apmērā katram.<br>*Spēkā esošs*<br><small>Žurn. Nr. 1096, lēmums 26.04.1995, tiesnese Līga Eglīte</small> | 1/3; 1/3; 1/3; 0 | |
| 3.1. | Uz 1995.gada 17.maijā noslēgtā dāvinājuma līguma pamata ir nostiprinātas īpašuma tiesības ILZEI SŪNIŅAI, dzimusi 1971.gadā Talsos, personas kods 220571-12503.<br>*Spēkā esošs*<br><small>Žurn. Nr. 1509, lēmums 09.06.1995, tiesnese Ilga Neimane</small> | 1; 0; 0; 0 | |
| 4.1. | Īpašnieks: SIA "LION+CO LATVIA LTD", nodokļu maksātāja kods 40003113173. Saistīts ar ierakstiem: II daļas 1.iedaļa 5.1, 6.1, 7.1 (233098004769)<br>*Spēkā esošs* | 1 | |
| 5.1. | Īpašuma tiesības nostiprinātas uz visu īpašumu. Pirkuma cena Ls.65000.<br>*Spēkā esošs* | | |
| 6.1. | Pamats: 1998. gada 12. marta pirkuma līgums.<br>*Spēkā esošs* | | |
| 7.1. | Īpašnieks ILZE SŪNIŅA, personas kods 220571-12503. Īpašuma tiesības izbeigušās.<br>*Spēkā esošs*<br><small>Žurn. Nr. 4769, lēmums 15.05.1998, tiesnese Smaida Grava</small> | 0 | |
| 8.1. | Īpašnieks: LION+CO LATVIA LTD, Sabiedrība, nodokļu maksātāja kods 40003113173. Domājamā daļa īpašumā samazinājusies par 1/2.<br>*Spēkā esošs* | 1/2 | |
| 8.2. | Īpašnieks: AKCIJU SABIEDRĪBA LION AG.<br>*Spēkā esošs* | 1/2 | |
| 8.3. | Īpašuma tiesība nostiprināta uz zemes un ēkas domājamo daļu.<br>*Spēkā esošs* | | |
| 8.4. | Pamats: 2003. gada 7. jūlija pirkuma līgums reģ. ar nr.15684.<br>*Spēkā esošs* | | 32,500.00LVL |
| 8.5. | Īpašuma kadastrālā vērtība:<br>*Spēkā esošs*<br><small>Žurn. Nr. 300000677159, lēmums 17.02.2004, tiesnese Baiba Strauta</small> | | 59,491.00LVL |
| 9.1. | Persona: LION+CO LATVIA LTD, Sabiedrība, nodokļu maksātāja kods 40003113173. Īpašuma tiesība izbeigusies.<br>*Spēkā esošs* | 0 | |
| 9.2. | Īpašnieks: AKCIJU SABIEDRĪBA LION AG. Domājamā daļa īpašumā palielinājusies par 1/2.<br>*Spēkā esošs* | 1 | |
| 9.3. | Pamats: 2003. gada 11. jūlija pirkuma līgums, reģ. ar nr.16308.<br>*Spēkā esošs*<br><small>Žurn. Nr. 300000686606, lēmums 26.02.2004, tiesnese Baiba Strauta</small> | | 32,500.00LVL |

63.

| 10.1. | Īpašnieks: AKCIJU SABIEDRĪBA LION AG. Domājamā daļa īpašumā samazinājusies par 1/2.<br>*Spēkā esošs* | 1/2 |
|---|---|---|
| 10.2. | Īpašnieks: UĢIS TABORS, personas kods 010167-13107.<br>*Spēkā esošs* | 1/2 |
| 10.3. | Pamats: 2005. gada 1. jūnija Nekustamā īpašuma-ēkas pirkuma līgums.<br>*Spēkā esošs* | 351,400.00LVL |
| 10.4. | Īpašuma kadastrālā vērtība: zeme - Ls 13780, ēkas un būves - Ls 31529<br>*Spēkā esošs* | |
| | Žurn. Nr. 300001126213, lēmums 11.07.2005, tiesnese Liāna Liepiņa | |
| 11.1. | Persona: AKCIJU SABIEDRĪBA LION AG. Īpašuma tiesība izbeigusies.<br>*Spēkā esošs* | 0 |
| 11.2. | Īpašnieks: UĢIS TABORS, personas kods 010167-13107. Domājamā daļa īpašumā palielinājusies par 1/2.<br>*Spēkā esošs* | 1 |
| 11.3. | Pamats: 2005. gada 2. jūnija Nekustamā īpašuma-ēkas pirkuma līgums.<br>*Spēkā esošs* | 80,822.00LVL |
| | Žurn. Nr. 300001126226, lēmums 11.07.2005, tiesnese Liāna Liepiņa | |
| 12.1. | Īpašnieks: UĢIS TABORS, personas kods 010167-13107. Domājamā daļa īpašumā samazinājusies par 1/2.<br>*Spēkā esošs* | 1/2 |
| 12.2. | Īpašnieks: RENĀRS MIĶELSONS, personas kods 250377-11350.<br>*Spēkā esošs* | 1/2 |
| 12.3. | Pamats: 2008.gada 20. oktobra pirkuma līgums.<br>*Spēkā esošs* | 102,609.38LVL |
| | Žurn. Nr. 300002562951, lēmums 03.11.2008, tiesnese Inese Kazjonova | |
| 13.1. | Persona: UĢIS TABORS, personas kods 010167-13107. Īpašuma tiesība izbeigusies.<br>*Spēkā esošs* | 0 |
| 13.2. | Īpašnieks: RENĀRS MIĶELSONS, personas kods 250377-11350. Domājamā daļa īpašumā palielinājusies par 1/2.<br>*Spēkā esošs* | 1 |
| 13.3. | Pamats: 2008.gada 22. oktobra pirkuma līgums.<br>*Spēkā esošs* | 1,016,906.58LVL |
| 13.4. | Nekustams īpašums ir laulātā atsevišķa manta. Latvijas Republikas Uzņēmumu reģistrā 06.04.2006. reģistrētas laulāto mantiskās attiecības ar reģistra numuru 1004975 par visas mantas šķirtību starp laulātajiem. Laulātie: RENĀRS MIĶELSONS, personas kods 250377-11350 un LAURA MIĶELSONE, personas kods 190279-10515. Pamats : 2006.gada 4.aprīļa laulības līgums.<br>*Spēkā esošs* | |
| | Žurn. Nr. 300002562956, lēmums 03.11.2008, tiesnese Inese Kazjonova | |
| 14.1. | Persona: RENĀRS MIĶELSONS, personas kods 250377-11350. Īpašuma tiesība izbeigusies.<br>*Spēkā esošs* | 0 |
| 14.2. | Īpašnieks: Akciju sabiedrība "Parex banka", nodokļu maksātāja kods 40003074590.<br>*Spēkā esošs* | 1 |
| 14.3. | Pamats: 2011.gada 20. janvāra Rīgas apgabaltiesas Civillietu tiesu kolēģijas lēmums, lieta Nr.C04548210, C-1774/11 (stājies likumīgā spēkā 2011.gada 1.februārī).<br>*Spēkā esošs* | 250,000.00LVL |
| 14.4. | Īpašuma kadastrālā vērtība: Ls 116475.- (t.sk. zeme - Ls 68900.-, ēka - Ls 47575.-).<br>*Spēkā esošs* | |
| | Žurn. Nr. 300003002567, lēmums 09.03.2011, tiesnese Ligita Vecauziņa | |
| 15.1. | Persona: Reverta, Akciju sabiedrība, nodokļu maksātāja kods 40003074590. Īpašuma tiesība izbeigusies.<br>*Spēkā esošs* | 0 |
| 15.2. | Īpašnieks: NIF Dzīvojamie īpašumi, Sabiedrība ar ierobežotu atbildību, nodokļu maksātāja kods 40103253915.<br>*Spēkā esošs* | 1 |
| 15.3. | Pamats: 2013.gada 2.maija AS "Reverta" valdes lēmums Nr.5/31/13 par SIA "NIF Dzīvojamie īpašumi" pamatkapitāla palielināšanu.<br>*Spēkā esošs* | |
| | Žurn. Nr. 300003445133, lēmums 03.06.2013, tiesnese Gita Lilo | |

64.

| 16.1. | Persona: NIF Dzīvojamie īpašumi, Sabiedrība ar ierobežotu atbildību, nodokļu maksātāja kods 40103253915. Īpašuma tiesība izbeigusies. *Spēkā esošs* | 0 | |
|-------|------|---|---|
| 16.2. | Īpašnieks: Kentprom Investments, SIA, nodokļu maksātāja kods 40103716059. *Spēkā esošs* | 1 | |
| 16.3. | Pamats: 2013.gada 29.oktobra pirkuma līguma Grozījumi Nr.1; 2013.gada 2.oktobra nekustamā īpašuma pirkuma līgums. *Spēkā esošs* | | 376,000.14LVL |
| | Žurn. Nr. 300003536028, lēmums 13.11.2013, tiesnese Smaida Grava | | |

65.

# ANNEX 6



Latvijas Republikas Uzņēmumu reģistrs

# Sabiedrība ar ierobežotu atbildību "Mono"
## Limited Liability Company

## Overview

| | |
|---|---|
| **Registration number** | 40003004625 |
| **SEPA Creditor Identifier** | LV61ZZZ40003004625 |
| **Legal address** | Katlakalna iela 1, Rīga, LV-1073 |
| **Registered on** | 23.05.1991 |
| **Type** | Limited Liability Company |
| **Register** | Commercial Register |
| **Equity capital** | Registered equity: 17500000.00 EUR<br>Registered on: 09.12.2019<br>Paid-up equity: 17500000.00 EUR<br>Registered on: 27.01.2020 |
| **Annual reports submitted** | 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021 |

## Officers

| Person data | Position | Appointed | Registered on | Rights of representation |
|---|---|---|---|---|
| Savickis Germans<br><br>p.c. 101181-10627 | Executive Board | 05.07.2022 | 05.07.2022 | Right to represent individually |
| Kajems Biomins<br>p.c. 071248-11238 | Executive Board | 10.01.2009 | 10.01.2009 | Right to represent individually |
| **Note** | Ziņas par personas dzīvesvietas adresi izslēgtas 01.07.2011., pamatojoties uz Komerclikuma Pārejas noteikumu 23.punktu. | | | |

67.

## Members*

| Company register of shareholders has been added to the registration file on | 09.12.2019 |
|---|---|

| Member from | 03.12.2019 |
|---|---|
| Person data | Plotkin Aleksandr<br>p.c. 051159-14666 |

| Share% | Share | Nominal value | Total |
|---|---|---|---|
| 32.669% | 816725.0 | 7.0 EUR | 5717075.0 EUR |

| Member from | 03.12.2019 |
|---|---|
| Person data | Kajems Biomins<br>p.c. 071248-11238 |

| Share% | Share | Nominal value | Total |
|---|---|---|---|
| 17.90116% | 447529.0 | 7.0 EUR | 3132703.0 EUR |

| Member from | 03.12.2019 |
|---|---|
| Person data | Ulmans Mihails<br>p.c. 120653-11239 |

| Share% | Share | Nominal value | Total |
|---|---|---|---|
| 49.42984% | 1235746.0 | 7.0 EUR | 8650222.0 EUR |

*Members are:
Limited liability company - shareholders
Foreign representative office, branch of foreign company - foreign company (organization)
Partnership, European economic interest grouping - members
Permanent unit of trade union, arbitration court, institution, mission, monastery - founders
Sole trader - sole trader
Individual undertaking, farm, fishing undertaking, state-owned enterprise, municipal company, family association - owners
Branch - Latvian company
Branch of European economic interest grouping - groupings

## Beneficial owners

| Person data | Date from | Registered on |
|---|---|---|
| Plotkin Aleksandr<br>p.c. 051159-14666<br>Country of residence: Latvia<br>Citizenship: United States of America | 12.01.2018 | 12.01.2018 |

**Control type:** as a company member/shareholder

| Person data | Date from | Registered on |
|---|---|---|
| Uļmans Mihails<br>p.c. 120653-11239<br>Country of residence: Latvia<br>Citizenship: Latvia | 12.01.2018 | 12.01.2018 |

**Control type:** as a company member/shareholder

## Reorganization

| | |
|---|---|
| Acquired by acquisition of | Sabiedrība ar ierobežotu atbildību "Rīgas Pārstāvniecības un Realizācijas Grupa"<br>Reg. Num.: 40003555611 |
| Date | 22.10.2013 |

| | |
|---|---|
| Acquired by acquisition of | Sabiedrība ar ierobežotu atbildību "G. un I. nekustamie īpašumi"<br>Reg. Num.: 40003573104 |
| Date | 26.10.2011 |

| | |
|---|---|
| Acquired by acquisition of | SIA "LATGER"<br>Reg. Num.: 40003000680 |
| Date | 05.11.1996 |

## Securing measures

| | |
|---|---|
| Securing measure | Attachment |
| Imposed on | 07.06.2022 |
| Imposed by | Valsts policija Galvenā kriminālpolicijas pārvalde<br>Kriminālizmeklēšanas pārvalde |
| Case No. | 11511001018 |

| | |
|---|---|
| Note | Ar Valsts policijas Galvenā kriminālpolicijas pārvaldes Kriminālizmeklēšanas pārvaldes 30.05.2022. lēmumu piemērots arests kriminālprocesā Nr.11511001018 aizdomās turētā Mihaila Uļmana, personas kods 120653-11239, mantai - SIA "Mono" (reģ.Nr. 40003004625, juridiskā adrese: Katlakalna iela 1, Rīga) 1235746.00 (viens miljons divsimt trīsdesmit pieci tūkstošiem septiņsimt četrdesmit sešām) kapitāldaļām ar vērtību 8650222.00 EUR (astoņi miljoni sešsimt piecdesmit tūkstoši divsimt divdesmit divi eiro un nulle centi), lai nodrošinātu procesuālo izdevumu, cietušajam nodarītā kaitējuma kompensācijas piedziņu un arī iespējamo mantas konfiskāciju kā papildsodu. |
| Imposed regarding the shares owned by | Uļmans Mihails p.c. 120653-11239 |

## Branches

| Branch name | Address | Branch registered on |
|---|---|---|
| SIA "MONO" filiāle "Mono-Logistik" Reg. Num.: 40003250202 | Rīga, Cesvaines iela 15 | 24.03.1995 |

Information is true and reliable, and corresponds to entries of the registers kept by the Enterprise Register of the Republic of Latvia and other registered information

www.ur.gov.lv          Phone number: 67 031 703          Email: pasts@ur.gov.lv

https://info.ur.gov.lv/#/legal-entity/40003004625

70.



**TNT** INT/AIR

**2**

| Con No. **301788959** | |
|---|---|
| Piece **1 of 1** | Weight **2.00kg** |

**Service**
12:00 Express
Options

Customer Reference
S/R Account No **000104586**

**Origin** **RIX** Pickup Date 16 Jan 2023

Sender
**Kristaps Bunkus**
Alberta iela 12-5
Riga LV-1010
LV

- - - - - - - - - - - - - - - - - - - - - - -

Receiver
**Debra D. Lucas**
+1602-322-7200

Sandra Day O'Connor United States Cour..
85003-2118
401 W. Washington St., Suite 1
Phoenix 85003
US

**Routing** **LGG-1 MEM**

**Sort**

| Postcode / Cluster Code | **85003** |
|---|---|

Dest Depot **CA4 18**

Delivery instructions:





FILED _____ _____ LODGED
_____ RECEIVED _____ COPY

JAN 1 8 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY